**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **QBE INSURANCE CORPORATION,** | ) | |
|     **as subrogee of Teague Properties,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 3:07-cv-393-MEF** |
| | ) | |
| **THE ROOFING COMPANY, a** | ) | |
| **Corporation; MICHAEL FULGHUM,** | ) | |
| **An individual; Fictitious Defendants A-Z** | ) | |
| **Whose name and identity are unknown,** | ) | |
| **Include those individuals, corporations,** | ) | |
| **and entities that were involved in the** | ) | |
| **negligent and/or wanton construction** | ) | |
| **of the roof which is the subject of the** | ) | |
| **this litigation,** | ) | |
| | ) | |
|     **Defendants.** | ) | |

**MOTION FOR LEAVE TO AMEND PLAINTIFF'S EXPERT DISCLOSURE**

COMES NOW the Plaintiff QBE Insurance Corporation (hereinafter referred to as "Plaintiff" or "QBE"), and requests leave to amend its expert disclosure list to include Jeffrey A. Tarbutton as an expert for the Plaintiff. In support of this motion, Plaintiff states as follows:

1.      Pursuant to this Court's Scheduling Order, Plaintiff designated Norman Johnson, a roof consultant, as its expert on December 14, 2007. (Exhibit A) At said time, Plaintiff reserved the right to supplement and augment its disclosure as necessary, particularly for rebuttal testimony needed to refute or rebut the contentions and testimony of the Defendant's expert(s).

2.      On January 15, 2008, Defendant identified Daniel Sheehan, a civil engineer, as its expert. (Exhibit B)

3.      The parties were engaged in settlement negotiations until February 4, 2008. When said settlement negotiations proved unsuccessful on February 4, the parties

proceeded with scheduling numerous depositions for February 18, 2008. Plaintiff at such time retained Jeffrey A. Tarbutton, a structural engineer, as an expert consultant to investigate the loss in this matter from an engineering prospective. Upon notification of Mr. Tarbutton's assessment of the roof collapse, which is the basis of the Plaintiff's claim, Plaintiff retained Mr. Tarbutton as a rebuttal expert.

4.      On February 14, 2008, Plaintiff via electronic mail to the attorney for the Defendant disclosed Mr. Tarbutton as one of the Plaintiff's experts and notified said counsel that Mr. Tarbutton would be available to be deposed on Monday, February 18, 2008. Plaintiff also notified counsel that Mr. Tarbutton's report would be forwarded to him the following day upon receipt. (Exhibit C) No objection was made to the disclosure or deposition of said expert at this time.

5.      Upon receipt of Mr. Tarbutton's final report on February 15, 2008, Plaintiff forwarded said report to opposing counsel via electronic mail at 12:26p.m. (Exhibit C) Plaintiff also called opposing counsel's office to notify them that the aforementioned electronic mail had been sent to opposing counsel.

6.      On Monday, February 18, 2008, Mr. Tarbutton drove from Norcross, Georgia to Montgomery, Alabama for his deposition. Counsel for the Defendant was provided a courtesy copy of Mr. Tarbutton's report for his review prior to the deposition. Thereafter, Jeffrey Tarbutton was deposed by the attorney for the Defendant.

7.      Because counsel for the Defendant expressed his desired to present Mr. Tarbutton's report to his expert, Mr. Daniel Sheehan, Plaintiff agreed to re-open Mr. Tarbutton's deposition in the near future should the need arise and also agreed to postpone Mr. Sheehan's deposition that was originally noticed and scheduled for February 18, 2008 via telephone, until he has had an opportunity to review Mr. Tarbutton's report.

2

8.      The Defendant will not be prejudice by allowing Mr. Jeffrey A. Tarbutton to serve as an expert witness in this matter, particularly given that the Defendant is currently in possession of Mr. Tarbutton's final report and has depose him. Plaintiff will however be prejudice if not afforded the opportunity to thoroughly present its case and rebut the Defendant's contentions.

WHEREFORE, based upon the foregoing, the Plaintiff respectfully moves this Honorable Court for leave to proceed with issuing the Plaintiff's Amended Expert Disclosure, attached hereto as Exhibit D, to the Defendant and to permit Mr. Jeffrey A. Tarbutton to testify at the trial of this matter.

Respectfully submitted,

/s/ Thomas T. Gallion, III
Thomas T. Gallion, III (ASB-5295-L74T)
One of the Attorneys for the Plaintiff

OF COUNSEL:

Jamie A. Johnston, Esq.
Felicia A. Long, Esq.
HASKELL SLAUGHTER YOUNG & GALLION, L.L.C.
305 South Lawrence Street
P.O. Box 4660
Montgomery, Alabama  36103-4660
(334) 265-8573          Telephone
(334) 264-7945          Facsimile
mp@hsy.com
jj@hsy.com
fal@hsy.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of February 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following parties or counsel:

Robert E. Parsons, Esq.
Parsons, Lee & Juliano, P.C.
300 Protective Center
2801 Highway 280 South
Post Office Box 530630 (35253-0630)
Birmingham, Alabama 35223-2480


/s/ Thomas T. Gallion, III
OF COUNSEL


#31246
63008-054

# Exhibit A



Felicia A. Long
fal@hsy.com

Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104
Post Office Box 4660
Montgomery, Alabama 36103-4660
t. 334.265.8573  |  f. 334.264.7945

December 14, 2007

*VIA ELECTRONIC MAIL & FIRST CLASS MAIL*

Robert E. Parsons, Esq.
Parsons, Lee & Juilano, PC
P.O. Box 530630
Birmingham, Alabama  35253-0630

      **RE:**    ***QBE v. The Roofing Company, Michael Fulghum, et al.***
                **In the United States District Court, Middle District of Alabama,**
                **Eastern Division**
                **Civil Action No.:  3:07-cv-393**

Dear Mr. Parsons:

      Enclosed are Plaintiff's Expert Disclosure and Plaintiff's Response to Defendants' Interrogatories.

      When I was reviewing Defendants' responses to 1) Plaintiff's Interrogatories and Request for Production of Documents to Defendant The Roofing Company and 2) Plaintiff's Interrogatories and Request for Production of Documents to Defendant Michael Fulghum, I noticed that several of the responses stated that you would produce documents responsive to the respective discovery request. However, we did not receive any such documents.  Accordingly, please produce documents responsive to Interrogatory #12 (directed to The Roofing Company); RFPD Nos. 1, 2, 4, 5, 8 (directed to The Roofing Company); and RFPD Nos.1, 2, 5, 6 (directed to Michael Fulghum).

                Sincerely,

                Felicia A. Long

cc:    Jamie A. Johnston, Esq. *(via electronic mail only)*

#29196
63008-054

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **QBE INSURANCE CORPORATION,** | ) | |
| as subrogee of Teague Properties, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 3:07-cv-393-MEF** |
| | ) | |
| **THE ROOFING COMPANY, a** | ) | |
| **Corporation; MICHAEL FULGHUM,** | ) | |
| **An individual; Fictitious Defendants A-Z** | ) | |
| **Whose name and identity are unknown,** | ) | |
| **Include those individuals, corporations,** | ) | |
| **and entities that were involved in the** | ) | |
| **negligent and/or wanton construction** | ) | |
| **of the roof which is the subject of the** | ) | |
| **this litigation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S EXPERT DISCLOSURE**

Pursuant to this Court's August 8, 2007 Uniform Scheduling Order (doc no. 16), Plaintiff QBE Insurance Corporation, as subrogee of Teague Properties, designates the following expert that it may call to provide expert testimony at the trial of this matter regarding, but not limited to, the cause and origin of the roof collapse at the Lakeview Building located in West Point, Georgia on or about August 9, 2006:

**Norman A. Johnson, Roof Consultant**
**Norman A. Johnson & Associates**
**1506 Sanden Ferry Drive**
**Decatur, Georgia 30033-3348**

Plaintiff reserves the right to call any and all expert witnesses disclosed by any other party to this lawsuit but not called to testify at trial. Plaintiff also reserves the right to supplement and augment its disclosure as necessary and further reserves the right to call experts not named to testify at trial, whose testimony is needed to aid in the Plaintiff's action and/or to refute or rebut the contentions and testimony of the other parties' experts.

Respectfully submitted,

FELICIA A. LONG (ASB-5532-F61L)
One of the Attorneys for the Plaintiff

OF COUNSEL:

Thomas T. Gallion, III
Jamie A. Johnston
HASKELL SLAUGHTER YOUNG & GALLION, L.L.C.
305 South Lawrence Street
P.O. Box 4660
Montgomery, Alabama  36103-4660
(334) 265-8573        Telephone
(334) 264-7945        Facsimile
mp@hsy.com
jj@hsy.com
fal@hsy.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2007, a copy of the foregoing document was served upon the following parties or counsel by causing a true and complete copy of same to be deposited in the United States mail, sufficient first class postage prepaid, addressed as follows:

Robert E. Parsons
Parsons, Lee & Juliano, P.C.
300 Protective Center
2801 Highway 280 South
Post Office Box 530630 (35253-0630)
Birmingham, Alabama 35223-2480

OF COUNSEL

#29839
63008-054

2

[Plaintiff's Responses to Defendant's Interrogatories
are omitted from this exhibit due to
the volume of said responses.]

# Exhibit B

# PARSONS, LEE & JULIANO, P. C.

ATTORNEYS AT LAW

300 PROTECTIVE CENTER

2801 HIGHWAY 280 SOUTH

BIRMINGHAM, ALABAMA 35223-2480

---

TELEPHONE 205-326-6600

FACSIMILE 205-324-7097

January 15, 2008

ROBERT E. PARSONS
JASPER P. JULIANO
MARCUS W. LEE
MARDA W. SYDNOR +
DAVID A. LEE
DEBORAH ANN WAKEFIELD
DOROTHY A. POWELL*
JOHN M. BERGQUIST
PAUL J. DeMARCO
JAMES A. WYATT, III
PAUL M. JULIANO
MILES E. GRESHAM, JR.

+ALSO ADMITTED IN VIRGINIA
*ALSO ADMITTED IN MISSISSIPPI

MAILING ADDRESS:

POST OFFICE BOX 530630

BIRMINGHAM, ALABAMA 35253-0630

TAX I.D. #63-0922938

www.pljpc.com

Ms. Jamie A. Johnston
Haskell, Slaughter, Young & Gallion, LLC
P. O. Box 4660
Montgomery, AL 36103-4660

     Re:    QBE Insurance v. The Roofing Company, et al
            United States District Court for the Middle District of Alabama
            Eastern Division; 3:07-cv-393-MEF
            Our File:    1404-00027

Dear Jamie:

The following information is sent to you for the purpose of complying with Rule 26(a)(2).

The defendants will call as an expert Daniel E. Sheehan, P.E., Senior Project Engineer, SEA, Ltd., 955 Hurricane Shoals Road, Suite 102, Lawrenceville, Georgia 30043.

Enclosed is a copy of Mr. Sheehan's report dated February 21, 2007 together with a copy of his professional resume.

Mr. Sheehan will refer to photographs made by him and also photographs made by Mr. Lawson Thompson of Frontier Adjusters and your expert, Norman A. Johnson.

Mr. Sheehan's hourly charge for professional services is $205.

As previously requested, I need to take the depositions of Mr. Norman Johnson and Mr. Phil Teague. Please call me about some dates in February.

Ms. Jamie Johnston
January 15, 2008
Page 2

      Thank you very much.

                Very truly yours,

                PARSONS, LEE & JULIANO, P.C.

                Robert E. Parsons

REP:mbd
Enclosures



955 Hurricane Shoals Road
Suite 102
Lawrenceville, Georgia 30043
770.339.7672 • 800.749.7672
Fax 770.339.1876
www.SEAlimited.com

February 21, 2007

Mr. Lawson Thompson
Frontier Adjusters
P.O. Box 680364
Marietta, Georgia  30068-0007

      Re:    **Partial Building Collapse**
            Insured:  Mike Fulghum dba The Roofing Company
            Claimant: Teague Properties
            Loss Location:  The Lakeview Building
                              Highway 29
                              Westpoint, Georgia
            Date of Loss:  August 6, 2006
            **Frontier File No. 10026646**
            **SEA Project No. 216957**

Dear Mr. Thompson:

Per your request, SEA, Ltd. has performed an examination and evaluation of a partial roof collapse which took place at the above-referenced building location.  A verbal report of our findings has been provided to you; this letter report, accompanied by photographs in bulk form, will conclude SEA's investigation into this matter.

A site visit was performed on November 8, 2006 by Dan Sheehan, P.E., at which time a visual and photographic survey was performed.

The building in question was of an unknown age, however, it was obviously quite old.  It was a warehouse type structure that utilized a wood-framed roof system.  Columns were 8 x 8 wood posts which supported built-up wood beams.  The wood beams were constructed of 10"-deep members, some of which were 3 x 10s and some of which were 2 x 10s; 2 x 6 purlins spanned between these beams.  The purlins were spaced at 2' on center; 1 x 4 tongue-and-groove wood decking was supported on the purlins.  A typical bay in the building in question measured approximately 14' x 14'.

The insured, The Roofing Company, had reportedly installed the single-ply membrane that was in place at the time of the partial roof collapse.  In examining the debris, the new roofing was a recover system in that the existing built-up roof was left in place, 1/2" rigid insulation was placed

ATLANTA • BALTIMORE/WASHINGTON • CHICAGO • CLEVELAND • COLUMBUS • FORT LAUDERDALE • HOUSTON • JACKSONVILLE • ST. LOUIS • TAMPA

Mr. Lawson Thompson
February 21, 2007
Page 2

over the existing roof, and the single-ply membrane was then installed. This is a common and acceptable roofing practice which results in very little additional weight being placed on the existing roof structure.

The collapse zone extended into approximately six bays of the building, with the primary collapse zone encompassing approximately four bays, or an area approximately 28' x 28'. The collapse zone was located adjacent to a single scupper which serviced an internal roof drainage system. The scupper was located at a 1-1/2' (±)-tall parapet wall. This scupper was the primary and apparently only roof drainage provision for this section of the roof.

You provided us with a letter dated October 20, 2006 from Hacker Claims Services where it was alleged that the roof had collapsed as the result of the scupper having been clogged by roofing debris or had been covered during the course of the re-roofing project. It further stated that the roof had collapsed due to the weight of the water on the roof, which resulted due an alleged blockage of the scupper or drain pipe. You also provided a copy of a summary of a recorded statement you obtained from the insured's foreman on this project, Mr. Stanley Brannon.

Based upon examination of the building and review of the aforementioned documents, it is SEA's opinion and conclusions that:

1.  The allegation made by Hacker Adjustment Services with regards to the insured's roofing activities resulting in a blockage of the roof drain resulting in the roof collapse is unsubstantiated. They provided no evidence to show that debris from the roofing project had clogged the drain, and the physical evidence showed that the scupper was, in fact, open and functional at the time of the collapse.

2.  Mr. Brannon reported that the debris was removed from the roof and that the scupper was open. Again, the physical evidence supported the fact that the scupper was, in fact, functional.

3.  Mr. Brannon also reported that the existing roof had numerous leaks that were repaired by the re-roofing process. It is entirely plausible that the replacement roof did, in fact, increase the amount of runoff being directed to the scupper in question because the pre-existing holes were essentially acting as additional drains.

4.  There was no evidence found that the insured was responsible for the collapse of the building as the result of any negligent or deficient work.

5.  The building had a flawed drainage system in that it had no emergency overflow provisions for instances where the rainfall intensity and amounts would overtax the single scupper or drain that the roof had in place.

Mr. Lawson Thompson
February 21, 2007
Page 3


Thank you for allowing SEA, Ltd. to assist you in this matter. If you have any questions or if
additional information becomes available, such as recorded rainfall amounts for the area on the
date of loss, please contact us.


Report Prepared By:                              Report Reviewed By:




Daniel L. Sheehan, P.E.                          Steven M. Herridge
Senior Project Engineer – Civil                  Civil Consultant
State of Georgia
Registration No. 20186


DTS:vh
Enclosure

## PROFESSIONAL RESUME OF DANIEL T. SHEEHAN, P.E.

January 2007

I.    General Information

Senior Project Engineer
SEA, Ltd.
955 Hurricane Shoals Road, Suite 102
Lawrenceville, Georgia 30043
(770) 339-7672
dsheehan@sealimited.com

II.    Education

Bachelor of Science
Civil Engineering
University of Toledo
1982

III.    Professional Summary

December 1990 to Present
Senior Project Engineer
SEA, Ltd.
Lawrenceville, Georgia

Perform examinations and evaluations of existing buildings and structures to determine
the presence, extent, and/or cause of damage to building components as the result of
some type of phenomena.  Numerous investigations of damage caused by wind events
(hurricanes, tornadoes, etc.) and vibrations from construction-related activities (blasting,
construction equipment).  Hurricane-related investigations also entail distinguishing wind
damage from storm surge/wave damage.  Investigations also involve evaluation of
existing construction to determine compliance with applicable codes and standards and
investigations of accidents or collapses that occur during the construction phase.

June 1987 to December 1990
Project Manager
S.P.C. Concrete, Inc.
Atlanta, Georgia

Project Manager for concrete forming-and-placing subcontractor.  Onsite supervision of
projects that included high-rise office buildings, parking garages, and a hotel.

Professional Resume
Daniel T. Sheehan, P.E.                                                    Page 2

June 1985 to June 1987
August 1982 to September 1983
District Engineer
Economy Forms Corporation
Atlanta, Georgia

District Engineer for a concrete formwork supplier. Design of formwork for various types of concrete structures, including bridges, stadiums, box culverts, retaining walls, etc.

April 1984 to June 1985
Project Engineer
Barry Levin & Associates
Atlanta, Georgia

Project Engineer for a structural engineering consulting firm. Emphasis on light commercial structures. Design of structural steel, concrete, timber, and masonry to produce working drawings, preparation of specifications, review of shop drawings and field inspections. Projects included strip shopping centers, warehouses, schools, and churches.

IV.    Professional Registration

State of Georgia, Registration No. 20186
State of Ohio, Registration No. 51479
State of North Carolina, Registration No. 16484
State of Florida, Registration No. 43134
State of South Carolina, Registration No. 16307

# Exhibit C

**Long, Felicia A.**

| | |
|---|---|
| **From:** | Long, Felicia A. |
| **Sent:** | Friday, February 15, 2008 12:26 PM |
| **To:** | 'rparsons@pljpc.com' |
| **Subject:** | RE: QBE v. The Roofing Co.- Depositions |
| **Attachments:** | MONTGOMERY-#31179-v1-QBE_Teague__Jeff_Tarbutton_s_CV.DOC; MONTGOMERY-#31178-v1-QBE_Teague__Jeff_Tarbutton_s_Report.PDF |

Mr. Parsons,

Attached please find Jeff Tarbutton's expert report and CV. Mr. Tarbutton will be here at 2:00p.m. on Monday for his deposition.

Felicia

**From:** Long, Felicia A.
**Sent:** Thursday, February 14, 2008 3:47 PM
**To:** 'rparsons@pljpc.com'
**Subject:** QBE v. The Roofing Co.- Depositions

Mr. Parsons,

I have the following witnesses lined up for Monday:

Norman Johnson (Plaintiff's expert- roofing consultant)
Phil Teague (Insured, Owner of Teague Properties)
Burt Hacker (Independent claims adjuster who investigated the site and took pictures)
Jeff Tarbutton (Plaintiff's expert- structural engineer)
Fred Gouge (QBE claim's adjuster- paid the claim)
Bobby Pike via telephone (Owner of MidSouth, the entity who assessed the property damage to the Lakeview Building)

We will only use Fred to testify that he paid the claim on behalf of QBE. He did not perform an onsite inspection himself. If you do not need to depose him, please just let me know.

I will send Jeff Tarbutton's report, photos, and CV to you tomorrow morning.

As for your adjuster at Frontier, I only need to depose him if you plan to call him as a witness in this case or he performed a site inspection himself at the Lakeview Building.

Please let me know if you have any questions.

Sincerely,
Felicia

_____

Felicia A. Long, Esq.
Haskell Slaughter Young & Gallion, LLC

305 South Lawrence Street
Montgomery, Alabama  36104
P.O. Box 4660 (36103-4660)
Phone:  334.265.8573
Fax:  334.264.7945
fal@hsy.com
www.hsy.com




Kimley-Horn
and Associates, Inc.

*Via Email fal@hsy.com*

February 13, 2008

Felicia A. Long
Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104

Suite 600
3169 Holcomb Bridge Road
Norcross, Georgia
30071

       Re: Analysis of Roof Collapse
          Lakewood Building
          545 3rd Avenue
          West Point, GA 31833
          Date of loss: August 9, 2006
          KHA Project No.: 019723000

Dear Ms. Long:

According to your letter of February 7, 2008 and our telephone conversations, I have completed an investigation of the collapse of a roof at the Lakeview Building, at 545 Third Avenue, West Point, Georgia. The roof collapsed August 9, 2006. The following is a summary of my findings.

**Background Information**

The subject building is owned by Mr. Phil Teague. It is an old, wood-framed building and appears to have been utilized principally as a warehouse.

At the time of the collapse, the building was being re-roofed, which I understand was necessitated by hail damage to several sections of the roof on the building. The roofing work was being done by Mr. Mike Fulghum d/b/a The Roofing Company.

The building essentially has four different sections. There is a large western section, which borders three smaller sections on the eastern end of the building. Three of four sections on the roof were covered with a white polymer membrane material. The fourth section of the building was covered with a painted corrugated metal roof. The metal roof section was at the southeast part of the building. The north slope of the metal roof section, the two easterly membrane-covered roofs, and the western section of the building all drained to a sump or drain box which is located near the center of a wall which

TEL  770 825 0744

FAX  770 825 0074



Kimley-Horn
and Associates, Inc.

divides the western section of the roof from the other three sections. Thru-wall scuppers allow water from the western slope and the northeastern section of the roof to drain to the drain box. The central section of the roof, above the area of the loading dock, drains westerly toward the drain box but does not pass through a scupper.

Following the collapse, it was investigated by Mr. Norman A. Johnson, of Norman A. Johnson and Associates, Inc. who viewed the site August 9, 2006, on the date of loss. A subsequent investigation was performed by S.E.A. Limited of Lawrenceville, Georgia, and was based on a site visit performed November 8, 2006 by Mr. Dan Sheehan, P.E. As part of our investigation, I reviewed these reports.

### Summary of Findings
The following summarizes my most significant observations and conclusions regarding the loss.

- I conducted a site visit February 11, 2008, at which time I made a visual and photographic survey of the affected portion of the building.
- I photographed the debris field in the area where the roof had collapsed, and removed portions of the debris to expose a wood post which had been approximately in the center of the collapsed area.
- I took rough measurements of the building, to allow for an estimate of the roof area and associated drainage required.
- Selected photographs from the site visit are appended for your review and file. There are additional photographs which I took, which will remain on file for future reference, if needed.
- The orientation of the collapse is consistent with a ponding-induced failure. As noted in the reports by S.E.A. and Johnson, the polymer roof was being replaced on the building. The replacement procedure included the removal of a white polymer membrane, which had been installed over the old gravel surface built-up roof over a white, expanded polystyrene recovered board. The new roof also incorporated a white polymer membrane, and was being installed over the old gravel surface built-up roof following removal of the original polymer roof and its underlying layer of insulation. This original layer of insulation was a ½ inch (approx.) layer of white, expanded polystyrene.
- The new membrane is a "TPO" membrane manufactured by Stevens Roofing Systems. It was being installed, as noted above, over a new layer of insulation, a pink-colored layer of extruded polystyrene. According to the S.E.A. report, dated February 27, 2007, "this is a common and acceptable roofing practice which resulted in very little additional weight being placed on the existing roof structure." I agree with this viewpoint.
- Sheehan's report also states that the roof "had numerous leaks that were repaired by the re-roofing process" and goes on to suggest that "pre-existing holes were essentially acting as additional drains". I do not agree with this assertion by Mr. Sheehan. The warehouse below the



west end of the was being used, according to Phil Teague, to store numerous cardboard boxes containing cushions for patio furniture, and was not affected by "numerous leaks", and certainly not heavy leakage which may have served as "drains".

- According to the Johnson report, dated August 11, 2006, "it is possible loose roofing material, from the roof retrofitting, collected at the only roof drain apparatus, the thru-the-wall scupper, by rain water flowing across the roof". According to Johnson, the associated accumulation of water on the roof caused the collapse.

- According to Sheehan, "no evidence" had been shown that debris from the roofing project had clogged the roof drain, and states "the physical evidence showed that the scupper was, in fact, open and functional at the time of the collapse." It appears to me that the scupper was, in fact, "open and functional", but this is quite different from saying that it was not also obstructed by debris. This statement also ignores the fact that, once the roof collapsed, the rapid flow of water from its surface would have the effect of removing, or at least relocating, debris which may have previously obstructed the scupper. It is also of some importance to note that neither Sheehan nor Johnson documented the condition of the drain immediately downstream of the drain box or sump adjacent to the central wall.

- As noted, the orientation of the debris field is consistent with what I would expect from a roof collapse caused by ponding. Two overall views of the collapse area are shown in Photos 1 and 2. These views are both taken from the west, facing the wall through which the scupper drains to the drain box. The drain box, as referred to in the Johnson report, is about a three foot square low point in the roof adjacent to the east side of the parapet wall which separates the westerly and easterly sections of the roof .

- The galvanized steel scupper box which had originally been in the short wall above the roof had fallen toward the floor with the collapse (Photo 3).

- I removed part of the collapse debris in order to expose and view the post which had been essentially in the center of the collapsed area. It is of note that the post was heavily deteriorated and had been severely compromised by termite damage. The base of the post is shown in Photo 4, and a close-up view of the base of the post is shown in Photo 5. An overall view of the final position of this post following the collapse is shown in Photo 6.

- The damage to the post extended several feet above the floor line; it could be directly observed in a wide split or opening in the face of the column (Photo 7).

- A view from the roof clearly shows how the section of the roof which collapsed had been sloped toward the scupper which penetrated the wall separating the western and eastern sections of the building (Photo 8). The drain box and the attached drain pipe were adjacent to the eastern side of this parapet wall. A view of the drain box is shown in Photo 9.

- During my site visit, I observed that there were several pieces of white expanded polystyrene insulation board which had accumulated in the large drain box. This white polystyrene board



stock was the material used in the original polymer membrane roof, which was in the process of being replaced when the collapse occurred. I removed these larger pieces of the polystyrene board, to observe the condition of the transition from the drain box to the attached 12-inch diameter drain pipe extending from it.

- There were many pieces of the white polystyrene insulation which had become lodged in the drain pipe. These are clearly shown in Photos 10 thru 12, which I took as I removed additional pieces of the polystyrene. The presence of white polystyrene segments in the drain box and in the upper end of the drain pipe had certainly compromised the drainage capacity of this system.
- The drain box was provided with a transition which connected to a 12-inch pipe. The 12-inch pipe ran laterally, then turned down and continued vertically in a small office near the parapet wall, and subsequently connected to a horizontal drain pipe. This pipe discharged into an old, open brick catch basin and to an underground pipe which conveyed the roof drainage away from the building.
- Following my site visit, I calculated the capacity of the scupper to drain the water from the west end of the roof. My analysis indicates that the scupper had more than twice the required capacity, assuming it was not blocked or obscured by roof debris. Sheehan's report states that the roofer reported that "the debris was removed from the roof and that the scupper was open." If these assertions are correct, they beg the question of just how the water rose to a depth sufficient to collapse the roof. The photos by Johnson, furthermore, clearly show that not all the debris was removed from the roof.

**Analysis and Conclusions**

On the basis of my observations, and the information summarized above, I offer the following conclusions.

1. The collapse which occurred at this building was due to ponding on the roof, which overloaded the eastern side of the west section of the roof.
2. Current code provisions require that roofs like this be provided a back-up or emergency drain. No such drain was provided for this roof. This was an open and obvious condition, and should have been noted by the roofer. It was very important that the scupper be maintained by the roofer at all times so that its capacity would not be compromised by trash or debris.
3. The capacity of the scupper detail as found was adequate for the intended rainfall. In the absence of some type of blockage or obstruction, the scupper and associated drain should have provided adequate runoff capacity to prevent the collapse.
4. The wood post in the area where the collapse occurred had been compromised by long term termite damage. The top of the post also had been provided with a nearly one-foot long shim or spacer, and about a third of the cross section of this shim had also been compromised by termite damage. The condition of the post, however, though compromised, had remained in



place and had suitably supported the roof loads until the time the re-roofing work was underway. Its pre-loss condition influenced, but did not cause, the collapse.

5. It should also be noted that the progression of the roof work was from east to west, and actually had been started along the east side of the west section of the roof. Accordingly, therefore, the roofing contractor had been working directly on and had passed over the area which later collapsed. This certainly suggests the roofer had not considered the roof to be unsafe for his workers or for the placement of materials.

6. In my opinion, the drainage on this roof, even though it lacked provision for emergency drainage, should have been adequate to drain this roof effectively had not either (1) the scupper been obstructed or compromised by roof debris becoming trapped in the upstream side of the scupper or (2) the drain pipe gotten blocked by the polystyrene fragments within it. I believe that one, and perhaps both, of these factors caused the collapse.

7. In my opinion, the presence of a number of small pieces of the white polystyrene within the roof drain indicates that debris from the roof had found its way to the drain box, which necessarily came from the work being done to replace the roof. Accordingly, therefore, the possibility is that not all the insulation fragments passed freely through the scupper, but may have gotten stuck or somehow restrained on the upstream (west) side of the scupper, obstructing the drainage and causing the collapse. Once the roof collapsed, of course, there should have been no further accumulation of the expanded polystyrene fragments within the drain box, but, at the time of my site visit, there were many small pieces lodged at the upper end of the drain pipe. In my view, this is an indication that roof debris had compromised the capacity of the scupper and/or drain, leading to the loss.

8. It is also possible that the scupper was blocked by a cardboard box(es). Johnson's photos clearly show boxes in the collapse debris which are different from the boxes stored in the warehouse by the insured.

9. I also note that the photos Mr. Johnson took do not show any sections or pieces of the expanded polystyrene in the large, upper portion of the drainage box, but neither Johnson nor Sheehan observed or reported any smaller fragments of the polystyrene which had gotten downstream of the box, and had lodged in the upper end of the pipe drain. There were, however, several larger pieces of the white insulation in the box when I observed it, thus some of the insulation had continued to break off and find its way to the box following the loss.

10. It is also a fact that the some of the larger pieces of the polystyrene which were eventually were found in the drain box were apparently not there at the time Mr. Johnson investigated the roof collapse. Following the loss, however, the remnant edge of the original polymer roof, which was in the process of being replaced, had been left with the edges of the white polystyrene insulation exposed to the weather. I believe it is possible that some of the polystyrene had become dislodged from that part of the roof since the loss and had perhaps been blown across

Kimley-Horn
and Associates, Inc.

the roof and subsequently landed on or had been washed into the drain box.  I also consider it very unlikely, however, that the numerous smaller pieces found inside the box and near the top of the pipe had all accumulated in the pipe following the loss.

In my opinion, this collapse was the result of ponding. I believe the ponding was caused by debris from the re-roofing work which got trapped or somehow stuck on the upstream (west) side of the scupper, compromising the capacity of the scupper. It also appears that polystyrene fragments from the old membrane roof had gotten lodged in the pipe drain extending from the drain box. The pre-loss condition of the scupper and drain and the lack of emergency overflow provisions were readily observable and should have been considered by the roofer.

I also acknowledge that the post in the center part of the collapse had sustained damage prior to the loss, but this pre-loss damage did not cause the collapse. It did influence the progression of the collapse and the resulting orientation and condition of the debris. This collapse would not have occurred unless the drainage capacity had been compromised during the re-roofing work.

This concludes my investigation of this roof collapse.  Please do not hesitate to contact me if you have any further questions or comments.  I have attached selected photographs for your review and file. Thank you for the opportunity to be of service.

Very truly yours,

KIMLEY-HORN AND ASSOCIATES, INC.

Jeffrey A. Tarbutton, P.E.

Enclosures: 12 Photographs

 Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: 019723000
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: 1 of 6

---

Photo No. 1



| Remarks: | View of collapse debris as seen from the west. |
|---|---|
| Location: | Floor Level |
| Elevation: | |

---

Photo No. 2

| Remarks: | Another view of collapse as seen from the west. |
|---|---|
| Location: | Floor Level |
| Elevation: | |



Kimley-Horn
and Associates. Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.:  019723000
KHA Rep.:  J. Tarbutton
Date:  February 11, 2008
Page:        2        of        6

| Photo No. 3 |
| --- |



| Remarks: | View of scupper as found, on west side of wall separating east and west sections of the building. |
| --- | --- |
| Location: | Scupper |
| Elevation: | |

| Photo No. 4 |
| --- |



| Remarks: | Base of collapsed column found beneath debris. Closer view is shown in Photo 5. |
| --- | --- |
| Location: | Floor Level |
| Elevation: | |



Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

## Teague Property
### Photograph Sheet

KHA Job No.: 019723000
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: 3 of 6

| Photo No. 5 |
| --- |



| Remarks: | Base of collapsed column found beneath debris. Column was heavily damaged by termites. |
| --- | --- |
| Location: Elevation: | Floor Level |

| Photo No. 6 |
| --- |



| Remarks: | Overall view of collapse, after column was exposed. The upper part of the collapsed column is seen in the left center part of the photo. |
| --- | --- |
| Location: Elevation: | Floor Level |



Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: 019723000
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: 4 of 6



| Photo No. 7 | |
|---|---|
| Remarks: | Closer view of bottom portion of column, showing wide gap due to old termite damage in the column. |
| Location: | Column |
| Elevation: | |

| Photo No. 8 | |
|---|---|
| Remarks: | View of collapse area as found, showing scupper location and its position with respect to the surrounding roof. |
| Location: | Roof level |
| Elevation: | |

Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: _019723000_
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: ___5___ of ___6___

| Photo No. 9 | |
|---|---|



| Remarks: | View showing expanded polystyrene fragments in the drain box. Additional fragments were found further down the drain, at the top of the connecting 12-inch pipe. |
|---|---|
| Location: | Drain Box |
| Elevation: | |

| Photo No. 10 | |
|---|---|



| Remarks: | Photos 10, 11, 12 show accumulation of polystyrene fragments in the upper end of the 12-inch drain pipe connected to the drain box. These are from the removal of the old membrane roof. |
|---|---|
| Location: | Drain Box |
| Elevation: | |



Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: 019723000
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: 6 of 6

Photo No. 11



Remarks:   Photos 10, 11, 12 show accumulation of polystyrene fragments in the upper end of the 12-inch
drain pipe connected to the drain box. These are from the removal of the old membrane roof.
Location:   Drain Box
Elevation:

Photo No. 12



Remarks:   Photos 10, 11, 12 show accumulation of polystyrene fragments in the upper end of the 12-inch
drain pipe connected to the drain box. These are from the removal of the old membrane roof.
Location:   Drain Box
Elevation:

 Kimley-Horn
and Associates, Inc.

## *Jeffrey A. Tarbutton, P.E.*

Jeff Tarbutton has 20 years of experience in geotechnical/materials engineering, failure analysis, and forensic engineering. His experience includes the investigation of numerous forensic cases, including roofing failures, building envelopes, structural damage and collapses, storm-related damage, and concrete and masonry failures. Mr. Tarbutton provides engineering support for many insurance-related companies and law firms throughout the Southeast.

### *Education*
– Civil Engineer Degree, Ohio State University, 1975
– Bachelor of Science, Civil Engineering, Ohio State University, 1973

### *Registration*
– Professional Engineer in Georgia, Maryland, Ohio, and South Carolina

### *Professional Organizations*
– American Society of Civil Engineers
– Southern Loss

### *Previous Experience*
– Project Engineer, S.E.A., Inc., Lawrenceville, GA, 1981-95
– Marketing Manager, CTL Engineering, Inc., Columbus, OH, 1981
– Project Engineer, CTL Engineering, Inc., Columbus, OH, 1977-81
– Geotechnical Engineer, Mason & Ray, Inc., Columbus, OH, 1976-77

### *Honors*
– Frank H. Eno Award, 1975

### *Presentations*
– Middle Georgia Claims Association, Presentation on Commercial and Residential EIFS Cladding, 1999
– Southern Loss Association, Presentation on Issues of EIFS Cladding, 1999
– Middle Georgia Claims Association, Presentation on Hail and Wind Damage to Roofing, 2001
– Seminar, State Farm Insurance, "Analysis of Roofing Claims," Atlanta, GA, 1994
– Seminar, Southern Loss Association, "Roofing Claims" (workshop on roofing materials, methods, and performance), 1994
– Seminar, Southern Loss Association, "Roofing Claims" (workshop on roofing materials, methods, and performance), Atlanta, GA, 1993
– Single Adjuster Program Workshop sponsored by South Carolina Windstorm and Hail Underwriting Association and the National Flood Insurance Program, "Flyers Versus Floater - Some General Considerations Regarding Wind and Flood Damages," Myrtle Beach, SC, 1991


Kimley-Horn
and Associates, Inc.

### Presentations, cont.

- Seminar, Pappas Contracting, Inc., "Use of Structural Engineer in Evaluation of Fire Damage," Atlanta, GA, 1991
- Seminar, S.E.A., Inc., "Analysis of a Fire-Damaged Structure," Atlanta, GA, 1991
- Coastal Claims Association, analysis of storm damage to structures, "Flyers Versus Floaters," Myrtle Beach, SC, 1991
- CORE meeting, Crawford & Company, "Wind Versus Flood Damage to Structures," Atlanta, GA, 1991
- McKenzie & McPhail, panel discussion of fire damage and construction considerations, Atlanta, GA, 1990
- Seminar, State Farm Insurance, hail damage to shingle roofs, Decatur, GA, 1989
- Seminar, South Carolina Claims Association, roof repair, hail damage, new roofing systems, Columbia, SC, 1987
- Seminar, S.E.A., Inc., for State Farm Insurance and Farmer's Insurance, "Structural Damage and Subrogation," 1987
- Seminar, Safeco Insurance, "Issues of Hail Damage to Roofing," Nashville, TN, 1987
- Seminar, South Carolina Farm Bureau Insurance, "Hail Damage to Roofs," Columbia, SC, 1987
- State Farm Insurance, "Structural Damage and Settlement," Marietta, GA, 1986

- Shingle roofing seminar, Insurance Adjusters and Contractors, Montgomery, AL, 1982
- Roofing seminar, "Quality Control in Single Ply Roofing," Evansville, IN, 1981
- Urethane Foam Contractors Association National Meeting, "Use of Independent Laboratories to Evaluate Foam Workmanship," 1981
- Roofing and building maintenance seminar, "Comparison of Roofing Systems," Evansville, IN, 1980
- Urethane Foam Contractors Association, panel discussion on contractor problems such as overspray, production, and quality control, Orlando, FL, 1979


Kimley-Horn
and Associates, Inc.

## *Jeffrey A. Tarbutton, P.E.*
*Failure Analysis/Forensic*
*Engineering*

### *Principal Areas of Expertise*

- Roofing/Coating Failures
- Structural Inspections
- Hydrology and Runoff
- Building Envelope Analysis

### *Roofing/Coating Failures*

- PVC roof failure, Southern Frozen Foods, Montezuma, GA
- Roofing failure, Carrier Corporation, City of Industry, CA
- Asphalt shingle failure, Newark, OH
- Exterior Insulation Finish Systems (EIFS) failures, various structures, Myrtle Beach, SC
- EPDM blow-off, Sanibel Island, FL
- Hypalon membrane failure, Huntsville, AL
- EPDM membrane, North Charleston, SC
- Roofing failure, built-up roof, National Machinery, Tiffin, OH
- Modified bitumen membrane analysis, Rockwell Industries, Kenton, OH
- Roofing failure analysis, built-up roofing, Jefferson, OH

### *Structural Inspections*

- Banana dock structural damage investigation, Tampa, FL
- Truss collapse analysis, Knoxville, TN
- Analysis of storm damage to wood trusses, Surfside Beach, SC
- Retaining wall failure, Norcross, GA
- Radio tower collapse, Loganville, GA
- Investigation of explosion damage to masonry walls, NC
- Collapse of steel frame barn, Erie, PA
- Analysis of tornado damage to residences, Pinellas Park, FL
- Inspection of roof and structure, precast concrete framing, Bethune, SC
- Deck collapse, wood frame, Dawsonville, GA
- Brick veneer collapse, Aaron Rents Building, Atlanta, GA
- Snowstorm and tornado damage analysis, HON Industries, Cedartown, GA
- Failure of brick pavement, AEP building, Columbus, OH
- Structural steel frame collapse, Orange, VA
- Breakage of buried service lines, Hartsfield International Airport, Atlanta, GA
- Investigation of mildew and mold damage to residences, Dayton, OH
- Fireplace analysis, residence fire, Marietta, GA
- Flooring analysis, Phipps Plaza Shopping Center, Atlanta, GA
- Blasting damage analysis, Columbia, SC
- Due diligence survey, hotel and retail complex, Coconut Grove, FL



Kimley-Horn
and Associates, Inc.

## *Jeffrey A. Tarbutton, P.E.*
### *Failure Analysis/Forensic Engineering*

### *Hydrology and Runoff*
– Collapse of dam, Enterprise, AL
– Flooding of residence, Atlanta, GA
– Silt accumulation in pond, Fayetteville, GA
– Runoff damage to pond, Cobb County, GA
– Analysis of siltation, Conyers, GA

### *Building Envelope Analysis*
– Water entry analysis, Sheraton Atlantic Shores, Myrtle Beach, SC
– Moisture damage to decking, residence, Fayetteville, GA
– Brick veneer failure, Carraway Methodist Hospital, Birmingham, AL
– Moisture damage analysis in residence, Norcross, GA
– Storm door analysis, Norcross, GA
– Evaluation of storm damage to exterior, Hilton Hotel, Myrtle Beach, SC
– Analysis of siding damage, Alcoa, TN
– Analysis of exterior insulation finish systems, Wilmington, NC

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **QBE INSURANCE CORPORATION,**  ) | |
|      **as subrogee of Teague Properties,** ) | |
|                              ) | |
|      **Plaintiff,**                   ) | |
|                              ) | |
| **v.**                             ) | **Civil Action No.: 3:07-cv-393-MEF** |

**QBE INSURANCE CORPORATION,**        )
    **as subrogee of Teague Properties,**  )
                                )
    **Plaintiff,**                   )

**v.**        )        **Civil Action No.: 3:07-cv-393-MEF**

**THE ROOFING COMPANY, a**        )
**Corporation; MICHAEL FULGHUM,**        )
**An individual; Fictitious Defendants A-Z**  )
**Whose name and identity are unknown,**  )
**Include those individuals, corporations,**  )
**and entities that were involved in the**  )
**negligent and/or wanton construction**  )
**of the roof which is the subject of the**  )
**this litigation,**        )
                              )
    **Defendants.**        )

<u>**PLAINTIFF'S AMENDED EXPERT DISCLOSURE**</u>

Pursuant to this Court's Scheduling Order and its Order granting Plaintiff's Motion for Leave to amend Plaintiff's Expert Disclosure, Plaintiff QBE Insurance Corporation, as subrogee of Teague Properties, designates the following experts that it may call to provide expert testimony at the trial of this matter regarding, but not limited to, the cause and origin of the roof collapse at the Lakeview Building located in West Point, Georgia on or about August 9, 2006:

> **Norman A. Johnson, Roof Consultant**
> **Norman A. Johnson & Associates**
> **1506 Sanden Ferry Drive**
> **Decatur, Georgia 30033-3348**
>
> **Jeffrey A. Tarbutton, P.E.**
> **Kimley-Horn and Associates, Inc.**
> **3169 Holcomb Bridge Road, Suite 600**
> **Norcross, Georgia 30071**

Plaintiff reserves the right to call any and all expert witnesses disclosed by any other party to this lawsuit but not called to testify at trial. Plaintiff also reserves the right

to supplement and augment its disclosure as necessary and further reserves the right to call experts not named to testify at trial, whose testimony is needed to aid in the Plaintiff's action and/or to refute or rebut the contentions and testimony of the other parties' experts.

Respectfully submitted,

_____
Thomas T. Gallion, III (ASB-5295-L74T)
One of the Attorneys for the Plaintiff

OF COUNSEL:

Jamie A. Johnston, Esq.
Felicia A. Long, Esq.
HASKELL SLAUGHTER YOUNG & GALLION, L.L.C.
305 South Lawrence Street
P.O. Box 4660
Montgomery, Alabama 36103-4660
(334) 265-8573        Telephone
(334) 264-7945        Facsimile
mp@hsy.com
jj@hsy.com
fal@hsy.com

## CERTIFICATE OF SERVICE

I hereby certify that on the ___ day of February, 2008, a copy of the foregoing document was served upon the following parties or counsel by causing a true and complete copy of same to be deposited in the United States mail, sufficient first class postage prepaid, addressed as follows:

Robert E. Parsons, Esq.
Parsons, Lee & Juliano, P.C.
300 Protective Center
2801 Highway 280 South
Post Office Box 530630 (35253-0630)
Birmingham, Alabama 35223-2480

_____
OF COUNSEL

#29839
63008-054

2