**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **QBE INSURANCE CORPORATION,** | ) | |
| **as subrogee of Teague Properties,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.: 3:07-cv-393-MEF** |
| | ) | |
| **THE ROOFING COMPANY, a** | ) | |
| **Corporation; MICHAEL FULGHUM,** | ) | |
| **An individual; Fictitious Defendants A-Z** | ) | |
| **Whose name and identity are unknown,** | ) | |
| **Include those individuals, corporations,** | ) | |
| **and entities that were involved in the** | ) | |
| **negligent and/or wanton construction** | ) | |
| **of the roof which is the subject of the** | ) | |
| **this litigation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**REPLY TO DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR A**</u>
<u>**PROTECTIVE ORDER, OR IN THE ALTERNATIVE, MOTION TO**</u>
<u>**RECONSIDER ORDER DATED 2/21/08**</u>

COMES NOW the Plaintiff QBE Insurance Corporation (hereinafter referred to as "Plaintiff" or "QBE"), and files this reply to Defendants' response to Plaintiff's Motion for a Protective Order to preclude Defendants from calling as an expert witness Daniel Sheehan, or in the alternative, Motion to Reconsider the Court's Order dated February 21, 2008 (Doc. # 24) such to permit Mr. Jeffrey A. Tarbutton to testify as a rebuttal expert at the trial of this matter. Plaintiff replies as follows:

1.      This Honorable Court is most likely familiar with the expression, "what's good for the goose is good for the gander." Plaintiff simply requests via the pending Motion that both parties be treated equally -- if Defendants are afforded leave to identify their expert and his report after the deadline, that Plaintiff be afforded this same relief; or if Plaintiff is not afforded leave to produce its expert witness's report after the deadline, that Defendants not be allowed to do so either.

2.     Defendants admit in their response that Defendants **did not** identify Daniel Sheehan as an expert or produce his report until **after** the deadline.[1] (Doc. #27, paragraph 2) Defendants fail to attempt to explain why said disclosure was untimely.

3.     Thirty days after Defendants' initial expert disclosure, on February 14, 2008, Plaintiff identified Mr. Jeffrey A. Tarbutton as a rebuttal expert pursuant to Rule 26(a)(2)(C), Fed. R. Civ. Proc. Immediately upon receipt, said expert's final report was forwarded to counsel for the Defendants as was promised the previous day.[2] (Exhibit A)

4.     Whereas, Defendants initial expert and said expert's report was disclosed to the Plaintiff one day after the deadline, Plaintiff's rebuttal expert was timely disclosed 30 days thereafter, pursuant to Rule 26(a)(2)(C), and only Mr. Jeffrey Tarbutton's final report was untimely by 12 hours and 26 minutes.[3]

5.     As Plaintiff previously pointed out, "[i]t is an abuse of discretion 'to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.' *United States v. Sellers*, 566 F.2d 884, 886 (4th Cir. 1977); see also *United States v. Parshall*, 757 F.2d 211, 213-14 (8th Cir. 1985); *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1140-41 (3d Cir. 1983)." *United States v. Lankford*, 955 F. 2d 1545, 1553 (11th Cir. 1992).  Thus, to allow the Defendants to present an engineering perspective on the cause of the roof collapse,

---

[1] While Defendants on December 21, 2008 acknowledged two entities who had investigated the loss, Frontier Adjusters and Daniel Sheehan, Defendants did not specify that Mr. Sheehan would be serving as an expert for the Defendants in this matter.  In fact, there are numerous individuals who have been identified by the parties as having inspected the loss and/or having personal knowledge of it, but obviously they were not all identified or retained as expert witnesses in this matter.

[2] Mr. Tarbutton's services were retained immediately after settlement negotiations proved unsuccessful on February 4.  Plaintiff made a conscious effort to obtain an expert who could investigate the loss, review the previously retained experts' reports, prepare a final report, and be available for a deposition by February 18, 2008; all of which were accomplished prior to or on February 18, 2008, at no prejudice to the Defendants. Mr. Tarbutton's final report most likely could have been produced on February 14, 2008, had he not been noticed for depositions in another litigation the week of February 14, 2008.

[3] *See* footnote 2.

2

the ultimate issue in this matter, particularly after the deadline, and to not allow the Plaintiff to present evidence from this same perspective is highly prejudicial and is respectfully an abuse of discretion.

6.    While the forgoing facts are the pertinent information for this Court to consider, the undersign counsel for Plaintiff wishes to clarify a couple of (mis)representations made to this Honorable Court in Defendants' Response (Doc. #27). First, while counsel for the Defendants claims in paragraph 5 that he did not receive a copy of Mr. Tarbutton's final report until February 18, 2008, undersigned counsel for the Plaintiff forwarded via electronic mail Mr. Tarbutton's final report to counsel for the Defendants on February 15, 2008 at 12:26p.m., affording opposing counsel four and a half hours prior to the close of the business day, or three full days, to review same before Mr. Tarbutton's deposition. (Exhibit A)  Plaintiff also placed a courtesy call at said time to opposing counsel's office to notify them that the aforementioned electronic mail had been sent to opposing counsel and to notify him of same.  Secondly, undersigned counsel did not agree that "Mr. Tarbutton's deposition was <u>due</u> to be postponed…" on February 18, 2008.   Rather, undersigned counsel graciously agreed to reopen Mr. Tarbutton's deposition after February 18, 2008, if opposing counsel so desired after he had further studied Mr. Tarbutton's report and consulted with his expert.[4]   On this same note, opposing counsel stated that he did not want to put his expert up for a deposition until his expert had a chance to review Mr. Tarbutton's report.   Undersigned counsel again amiably agreeable to postpone Mr. Sheehan's deposition until he had a chance to review Mr. Tarbutton's report. Undersigned counsel never agreed that "…Mr. Sheehan's deposition was <u>due</u> to be rescheduled…."  Undersigned counsel merely made good faith

---

[4] Mr. Tarbutton's deposition was briefly postponed on February 18, 2008, to allow opposing counsel time to review Mr. Tarbutton's report.

attempts to resolve the parties' discovery disputes in an effort to avoid having to burden this Court with same.

7.     Further, Defendants would not be prejudice by allowing Mr. Jeffrey A. Tarbutton to serve as an expert witness in this matter, particularly given that the Defendants are currently in possession of Mr. Tarbutton's final report and have deposed him.  It is immaterial for purposes of this pending Motion that Mr. Tarbutton did not visit the building made the basis of this suit until February 11, 2008, as said information goes to the weight of the evidence, not the admissibility thereof.  Nonetheless, a substantial portion of Mr. Tarbutton's opinion is based on information that was gathered immediately after the roof collapse.  It is also worthwhile to note that Defendants' expert did not visit the building until several months after the roof collapse himself.

WHEREFORE, based upon the foregoing, the Plaintiff respectfully moves this Honorable Court to issue an order precluding the Defendants from calling or otherwise using Daniel Sheehan, a professional engineer, as an expert witness.  Plaintiff requests in the alternative that this Court reconsider is Order date February 21, 2008 (Doc. # 24) such to grant the Plaintiff leave to proceed with issuing the Plaintiff's Amended Expert Disclosure and to permit Mr. Jeffrey A. Tarbutton to testify at the trial of this matter.

Respectfully submitted,

/s/ Felicia A. Long
One of the Attorneys for the Plaintiff

OF COUNSEL:

Thomas T. Gallion, III, Esq.
Jamie A. Johnston, Esq.
HASKELL SLAUGHTER YOUNG & GALLION, L.L.C.
305 South Lawrence Street
P.O. Box 4660
Montgomery, Alabama  36103-4660
(334) 265-8573          Telephone
(334) 264-7945          Facsimile
mp@hsy.com
jj@hsy.com
fal@hsy.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of February 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that will send notification of such filing to the following parties or counsel:

Robert E. Parsons, Esq.
Parsons, Lee & Juliano, P.C.
300 Protective Center
2801 Highway 280 South
Post Office Box 530630 (35253-0630)
Birmingham, Alabama 35223-2480


/s/ Felicia A. Long
OF COUNSEL

#31490
63008-054

# Exhibit A

**Long, Felicia A.**

| | |
|---|---|
| **From:** | Long, Felicia A. |
| **Sent:** | Friday, February 15, 2008 12:26 PM |
| **To:** | 'rparsons@pljpc.com' |
| **Subject:** | RE: QBE v. The Roofing Co.- Depositions |
| **Attachments:** | MONTGOMERY-#31179-v1-QBE_Teague__Jeff_Tarbutton_s_CV.DOC; MONTGOMERY-#31178-v1-QBE_Teague__Jeff_Tarbutton_s_Report.PDF |

Mr. Parsons,

Attached please find Jeff Tarbutton's expert report and CV. Mr. Tarbutton will be here at 2:00p.m. on Monday for his deposition.

Felicia

---

**From:** Long, Felicia A.
**Sent:** Thursday, February 14, 2008 3:47 PM
**To:** 'rparsons@pljpc.com'
**Subject:** QBE v. The Roofing Co.- Depositions

Mr. Parsons,

I have the following witnesses lined up for Monday:

Norman Johnson (Plaintiff's expert- roofing consultant)
Phil Teague (Insured, Owner of Teague Properties)
Burt Hacker (Independent claims adjuster who investigated the site and took pictures)
Jeff Tarbutton (Plaintiff's expert- structural engineer)
Fred Gouge (QBE claim's adjuster- paid the claim)
Bobby Pike via telephone (Owner of MidSouth, the entity who assessed the property damage to the Lakeview Building)

We will only use Fred to testify that he paid the claim on behalf of QBE. He did not perform an onsite inspection himself. If you do not need to depose him, please just let me know.

I will send Jeff Tarbutton's report, photos, and CV to you tomorrow morning.

As for your adjuster at Frontier, I only need to depose him if you plan to call him as a witness in this case or he performed a site inspection himself at the Lakeview Building.

Please let me know if you have any questions.

Sincerely,
Felicia

---

Felicia A. Long, Esq.
Haskell Slaughter Young & Gallion, LLC

305 South Lawrence Street
Montgomery, Alabama  36104
P.O. Box 4660 (36103-4660)
Phone:  334.265.8573
Fax:  334.264.7945
fal@hsy.com
www.hsy.com





Kimley-Horn
and Associates, Inc.

*Via Email fal@hsy.com*

February 13, 2008

Felicia A. Long
Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104

Suite 600
3169 Holcomb Bridge Road
Norcross, Georgia
30071

   Re: Analysis of Roof Collapse
    Lakewood Building
    545 3rd Avenue
    West Point, GA 31833
    Date of loss: August 9, 2006
    KHA Project No.: 019723000

Dear Ms. Long:

According to your letter of February 7, 2008 and our telephone conversations, I have completed an investigation of the collapse of a roof at the Lakeview Building, at 545 Third Avenue, West Point, Georgia. The roof collapsed August 9, 2006. The following is a summary of my findings.

**Background Information**

The subject building is owned by Mr. Phil Teague. It is an old, wood-framed building and appears to have been utilized principally as a warehouse.

At the time of the collapse, the building was being re-roofed, which I understand was necessitated by hail damage to several sections of the roof on the building. The roofing work was being done by Mr. Mike Fulghum d/b/a The Roofing Company.

The building essentially has four different sections. There is a large western section, which borders three smaller sections on the eastern end of the building. Three of four sections on the roof were covered with a white polymer membrane material. The fourth section of the building was covered with a painted corrugated metal roof. The metal roof section was at the southeast part of the building. The north slope of the metal roof section, the two easterly membrane-covered roofs, and the western section of the building all drained to a sump or drain box which is located near the center of a wall which

TEL  770 825 0744

FAX  770 825 0074

 Kimley-Horn
and Associates, Inc.

divides the western section of the roof from the other three sections.  Thru-wall scuppers allow water from the western slope and the northeastern section of the roof to drain to the drain box.  The central section of the roof, above the area of the loading dock, drains westerly toward the drain box but does not pass through a scupper.

Following the collapse, it was investigated by Mr. Norman A. Johnson, of Norman A. Johnson and Associates, Inc. who viewed the site August 9, 2006, on the date of loss. A subsequent investigation was performed by S.E.A. Limited of Lawrenceville, Georgia, and was based on a site visit performed November 8, 2006 by Mr. Dan Sheehan, P.E.  As part of our investigation, I reviewed these reports.

### *Summary of Findings*
The following summarizes my most significant observations and conclusions regarding the loss.

- I conducted a site visit February 11, 2008, at which time I made a visual and photographic survey of the affected portion of the building.
- I photographed the debris field in the area where the roof had collapsed, and removed portions of the debris to expose a wood post which had been approximately in the center of the collapsed area.
- I took rough measurements of the building, to allow for an estimate of the roof area and associated drainage required.
- Selected photographs from the site visit are appended for your review and file.  There are additional photographs which I took, which will remain on file for future reference, if needed.
- The orientation of the collapse is consistent with a ponding-induced failure.  As noted in the reports by S.E.A. and Johnson, the polymer roof was being replaced on the building.  The replacement procedure included the removal of a white polymer membrane, which had been installed over the old gravel surface built-up roof over a white, expanded polystyrene recovered board.  The new roof also incorporated a white polymer membrane, and was being installed over the old gravel surface built-up roof following removal of the original polymer roof and its underlying layer of insulation. This original layer of insulation was a ½ inch (approx.) layer of white, expanded polystyrene.
- The new membrane is a "TPO" membrane manufactured by Stevens Roofing Systems.  It was being installed, as noted above, over a new layer of insulation, a pink-colored layer of extruded polystyrene. According to the S.E.A. report, dated February 27, 2007, "this is a common and acceptable roofing practice which resulted in very little additional weight being placed on the existing roof structure."  I agree with this viewpoint.
- Sheehan's report also states that the roof "had numerous leaks that were repaired by the re-roofing process" and goes on to suggest that "pre-existing holes were essentially acting as additional drains". I do not agree with this assertion by Mr. Sheehan. The warehouse below the

◥■◣◥■◣ Kimley-Horn
and Associates, Inc.

west end of the was being used, according to Phil Teague, to store numerous cardboard boxes containing cushions for patio furniture, and was not affected by "numerous leaks", and certainly not heavy leakage which may have served as "drains".

- According to the Johnson report, dated August 11, 2006, "it is possible loose roofing material, from the roof retrofitting, collected at the only roof drain apparatus, the thru-the-wall scupper, by rain water flowing across the roof". According to Johnson, the associated accumulation of water on the roof caused the collapse.

- According to Sheehan, "no evidence" had been shown that debris from the roofing project had clogged the roof drain, and states "the physical evidence showed that the scupper was, in fact, open and functional at the time of the collapse." It appears to me that the scupper was, in fact, "open and functional", but this is quite different from saying that it was not also obstructed by debris. This statement also ignores the fact that, once the roof collapsed, the rapid flow of water from its surface would have the effect of removing, or at least relocating, debris which may have previously obstructed the scupper. It is also of some importance to note that neither Sheehan nor Johnson documented the condition of the drain immediately downstream of the drain box or sump adjacent to the central wall.

- As noted, the orientation of the debris field is consistent with what I would expect from a roof collapse caused by ponding. Two overall views of the collapse area are shown in Photos 1 and 2. These views are both taken from the west, facing the wall through which the scupper drains to the drain box. The drain box, as referred to in the Johnson report, is about a three foot square low point in the roof adjacent to the east side of the parapet wall which separates the westerly and easterly sections of the roof .

- The galvanized steel scupper box which had originally been in the short wall above the roof had fallen toward the floor with the collapse (Photo 3).

- I removed part of the collapse debris in order to expose and view the post which had been essentially in the center of the collapsed area. It is of note that the post was heavily deteriorated and had been severely compromised by termite damage. The base of the post is shown in Photo 4, and a close-up view of the base of the post is shown in Photo 5. An overall view of the final position of this post following the collapse is shown in Photo 6.

- The damage to the post extended several feet above the floor line; it could be directly observed in a wide split or opening in the face of the column (Photo 7).

- A view from the roof clearly shows how the section of the roof which collapsed had been sloped toward the scupper which penetrated the wall separating the western and eastern sections of the building (Photo 8). The drain box and the attached drain pipe were adjacent to the eastern side of this parapet wall. A view of the drain box is shown in Photo 9.

- During my site visit, I observed that there were several pieces of white expanded polystyrene insulation board which had accumulated in the large drain box. This white polystyrene board


Kimley-Horn
and Associates, Inc.

stock was the material used in the original polymer membrane roof, which was in the process of being replaced when the collapse occurred. I removed these larger pieces of the polystyrene board, to observe the condition of the transition from the drain box to the attached 12-inch diameter drain pipe extending from it.

- There were many pieces of the white polystyrene insulation which had become lodged in the drain pipe. These are clearly shown in Photos 10 thru 12, which I took as I removed additional pieces of the polystyrene. The presence of white polystyrene segments in the drain box and in the upper end of the drain pipe had certainly compromised the drainage capacity of this system.

- The drain box was provided with a transition which connected to a 12-inch pipe. The 12-inch pipe ran laterally, then turned down and continued vertically in a small office near the parapet wall, and subsequently connected to a horizontal drain pipe. This pipe discharged into an old, open brick catch basin and to an underground pipe which conveyed the roof drainage away from the building.

- Following my site visit, I calculated the capacity of the scupper to drain the water from the west end of the roof. My analysis indicates that the scupper had more than twice the required capacity, assuming it was not blocked or obscured by roof debris. Sheehan's report states that the roofer reported that "the debris was removed from the roof and that the scupper was open." If these assertions are correct, they beg the question of just how the water rose to a depth sufficient to collapse the roof. The photos by Johnson, furthermore, clearly show that not all the debris was removed from the roof.

***Analysis and Conclusions***

On the basis of my observations, and the information summarized above, I offer the following conclusions.

1. The collapse which occurred at this building was due to ponding on the roof, which overloaded the eastern side of the west section of the roof.

2. Current code provisions require that roofs like this be provided a back-up or emergency drain. No such drain was provided for this roof. This was an open and obvious condition, and should have been noted by the roofer. It was very important that the scupper be maintained by the roofer at all times so that its capacity would not be compromised by trash or debris.

3. The capacity of the scupper detail as found was adequate for the intended rainfall. In the absence of some type of blockage or obstruction, the scupper and associated drain should have provided adequate runoff capacity to prevent the collapse.

4. The wood post in the area where the collapse occurred had been compromised by long term termite damage. The top of the post also had been provided with a nearly one-foot long shim or spacer, and about a third of the cross section of this shim had also been compromised by termite damage. The condition of the post, however, though compromised, had remained in



Kimley-Horn
and Associates, Inc.

place and had suitably supported the roof loads until the time the re-roofing work was underway. Its pre-loss condition influenced, but did not cause, the collapse.

5.  It should also be noted that the progression of the roof work was from east to west, and actually had been started along the east side of the west section of the roof. Accordingly, therefore, the roofing contractor had been working directly on and had passed over the area which later collapsed. This certainly suggests the roofer had not considered the roof to be unsafe for his workers or for the placement of materials.

6.  In my opinion, the drainage on this roof, even though it lacked provision for emergency drainage, should have been adequate to drain this roof effectively had not either (1) the scupper been obstructed or compromised by roof debris becoming trapped in the upstream side of the scupper or (2) the drain pipe gotten blocked by the polystyrene fragments within it. I believe that one, and perhaps both, of these factors caused the collapse.

7.  In my opinion, the presence of a number of small pieces of the white polystyrene within the roof drain indicates that debris from the roof had found its way to the drain box, which necessarily came from the work being done to replace the roof.  Accordingly, therefore, the possibility is that not all the insulation fragments passed freely through the scupper, but may have gotten stuck or somehow restrained on the upstream (west) side of the scupper, obstructing the drainage and causing the collapse. Once the roof collapsed, of course, there should have been no further accumulation of the expanded polystyrene fragments within the drain box, but, at the time of my site visit, there were many small pieces lodged at the upper end of the drain pipe. In my view, this is an indication that roof debris had compromised the capacity of the scupper and/or drain, leading to the loss.

8.  It is also possible that the scupper was blocked by a cardboard box(es). Johnson's photos clearly show boxes in the collapse debris which are different from the boxes stored in the warehouse by the insured.

9.  I also note that the photos Mr. Johnson took do not show any sections or pieces of the expanded polystyrene in the large, upper portion of the drainage box, but neither Johnson nor Sheehan observed or reported any smaller fragments of the polystyrene which had gotten downstream of the box, and had lodged in the upper end of the pipe drain. There were, however, several larger pieces of the white insulation in the box when I observed it, thus some of the insulation had continued to break off and find its way to the box following the loss.

10. It is also a fact that the some of the larger pieces of the polystyrene which were eventually were found in the drain box were apparently not there at the time Mr. Johnson investigated the roof collapse. Following the loss, however, the remnant edge of the original polymer roof, which was in the process of being replaced, had been left with the edges of the white polystyrene insulation exposed to the weather. I believe it is possible that some of the polystyrene had become dislodged from that part of the roof since the loss and had perhaps been blown across



Kimley-Horn
and Associates, Inc.

Page 6 of 6

the roof and subsequently landed on or had been washed into the drain box. I also consider it very unlikely, however, that the numerous smaller pieces found inside the box and near the top of the pipe had all accumulated in the pipe following the loss.

In my opinion, this collapse was the result of ponding. I believe the ponding was caused by debris from the re-roofing work which got trapped or somehow stuck on the upstream (west) side of the scupper, compromising the capacity of the scupper. It also appears that polystyrene fragments from the old membrane roof had gotten lodged in the pipe drain extending from the drain box. The pre-loss condition of the scupper and drain and the lack of emergency overflow provisions were readily observable and should have been considered by the roofer.

I also acknowledge that the post in the center part of the collapse had sustained damage prior to the loss, but this pre-loss damage did not cause the collapse. It did influence the progression of the collapse and the resulting orientation and condition of the debris. This collapse would not have occurred unless the drainage capacity had been compromised during the re-roofing work.

This concludes my investigation of this roof collapse. Please do not hesitate to contact me if you have any further questions or comments. I have attached selected photographs for your review and file. Thank you for the opportunity to be of service.

Very truly yours,

KIMLEY-HORN AND ASSOCIATES, INC.

Jeffrey A. Tarbutton, P.E.

Enclosures: 12 Photographs



Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: _019723000_
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: _____1_____ of _____6_____

| Photo No. 1 |
| --- |

Remarks:     View of collapse debris as seen from the west.

Location:     Floor Level
Elevation:

| Photo No. 2 |
| --- |

Remarks:     Another view of collapse as seen from the west.

Location:     Floor Level
Elevation:



Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: 019723000
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: 2 of 6

| Photo No. 3 |
| --- |



| Remarks: | View of scupper as found, on west side of wall separating east and west sections of the building. |
| --- | --- |
| Location: | Scupper |
| Elevation: | |

| Photo No. 4 |
| --- |



| Remarks: | Base of collapsed column found beneath debris. Closer view is shown in Photo 5. |
| --- | --- |
| Location: | Floor Level |
| Elevation: | |

 Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.:  019723000
KHA Rep.:  J. Tarbutton
Date:  February 11, 2008
Page:        3       of       6

Photo No. 5



| Remarks: | Base of collapsed column found beneath debris. Column was heavily damaged by termites. |
|---|---|
| Location: Elevation: | Floor Level |

Photo No. 6

| Remarks: | Overall view of collapse, after column was exposed. The upper part of the collapsed column is seen in the left center part of the photo. |
|---|---|
| Location: Elevation: | Floor Level |

 Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: 019723000
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: 4 of 6

Photo No. 7



| Remarks: | Closer view of bottom portion of column, showing wide gap due to old termite damage in the column. |
| Location: | Column |
| Elevation: | |

Photo No. 8



| Remarks: | View of collapse area as found, showing scupper location and its position with respect to the surrounding roof. |
| Location: | Roof level |
| Elevation: | |



Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: _019723000_
KHA Rep.: J. Tarbutton
Date: February 11, 2008
Page: ___5___ of ___6___

---

Photo No. 9



| Remarks: | View showing expanded polystyrene fragments in the drain box. Additional fragments were found further down the drain, at the top of the connecting 12-inch pipe. |
|---|---|
| Location: | Drain Box |
| Elevation: | |

---

Photo No. 10



| Remarks: | Photos 10, 11, 12 show accumulation of polystyrene fragments in the upper end of the 12-inch drain pipe connected to the drain box. These are from the removal of the old membrane roof. |
|---|---|
| Location: | Drain Box |
| Elevation: | |


Kimley-Horn
and Associates, Inc.

3169 Holcomb Bridge Road-Ste 600
Norcross, GA 30071

Teague Property
**Photograph Sheet**

KHA Job No.: _019723000_
KHA Rep.: _J. Tarbutton_
Date: _February 11, 2008_
Page: ___6___ of ___6___

---

Photo No. 11

| Remarks: | Photos 10, 11, 12 show accumulation of polystyrene fragments in the upper end of the 12-inch drain pipe connected to the drain box. These are from the removal of the old membrane roof. |
|---|---|
| Location: | Drain Box |
| Elevation: | |

---

Photo No. 12

| Remarks: | Photos 10, 11, 12 show accumulation of polystyrene fragments in the upper end of the 12-inch drain pipe connected to the drain box. These are from the removal of the old membrane roof. |
|---|---|
| Location: | Drain Box |
| Elevation: | |


Kimley-Horn
and Associates, Inc.

## Jeffrey A. Tarbutton, P.E.

Jeff Tarbutton has 20 years of experience in geotechnical/materials engineering, failure analysis, and forensic engineering. His experience includes the investigation of numerous forensic cases, including roofing failures, building envelopes, structural damage and collapses, storm-related damage, and concrete and masonry failures. Mr. Tarbutton provides engineering support for many insurance-related companies and law firms throughout the Southeast.

### Education
– Civil Engineer Degree, Ohio State University, 1975
– Bachelor of Science, Civil Engineering, Ohio State University, 1973

### Registration
– Professional Engineer in Georgia, Maryland, Ohio, and South Carolina

### Professional Organizations
– American Society of Civil Engineers
– Southern Loss

### Previous Experience
– Project Engineer, S.E.A., Inc., Lawrenceville, GA, 1981-95
– Marketing Manager, CTL Engineering, Inc., Columbus, OH, 1981
– Project Engineer, CTL Engineering, Inc., Columbus, OH, 1977-81
– Geotechnical Engineer, Mason & Ray, Inc., Columbus, OH, 1976-77

### Honors
– Frank H. Eno Award, 1975

### Presentations
– Middle Georgia Claims Association, Presentation on Commercial and Residential EIFS Cladding, 1999
– Southern Loss Association, Presentation on Issues of EIFS Cladding, 1999
– Middle Georgia Claims Association, Presentation on Hail and Wind Damage to Roofing, 2001
– Seminar, State Farm Insurance, "Analysis of Roofing Claims," Atlanta, GA, 1994
– Seminar, Southern Loss Association, "Roofing Claims" (workshop on roofing materials, methods, and performance), 1994
– Seminar, Southern Loss Association, "Roofing Claims" (workshop on roofing materials, methods, and performance), Atlanta, GA, 1993
– Single Adjuster Program Workshop sponsored by South Carolina Windstorm and Hail Underwriting Association and the National Flood Insurance Program, "Flyers Versus Floater - Some General Considerations Regarding Wind and Flood Damages," Myrtle Beach, SC, 1991

 Kimley-Horn
and Associates, Inc.

### Presentations, cont.

- Seminar, Pappas Contracting, Inc., "Use of Structural Engineer in Evaluation of Fire Damage," Atlanta, GA, 1991
- Seminar, S.E.A., Inc., "Analysis of a Fire-Damaged Structure," Atlanta, GA, 1991
- Coastal Claims Association, analysis of storm damage to structures, "Flyers Versus Floaters," Myrtle Beach, SC, 1991
- CORE meeting, Crawford & Company, "Wind Versus Flood Damage to Structures," Atlanta, GA, 1991
- McKenzie & McPhail, panel discussion of fire damage and construction considerations, Atlanta, GA, 1990
- Seminar, State Farm Insurance, hail damage to shingle roofs, Decatur, GA, 1989
- Seminar, South Carolina Claims Association, roof repair, hail damage, new roofing systems, Columbia, SC, 1987
- Seminar, S.E.A., Inc., for State Farm Insurance and Farmer's Insurance, "Structural Damage and Subrogation," 1987
- Seminar, Safeco Insurance, "Issues of Hail Damage to Roofing," Nashville, TN, 1987
- Seminar, South Carolina Farm Bureau Insurance, "Hail Damage to Roofs," Columbia, SC, 1987
- State Farm Insurance, "Structural Damage and Settlement," Marietta, GA, 1986

- Shingle roofing seminar, Insurance Adjusters and Contractors, Montgomery, AL, 1982
- Roofing seminar, "Quality Control in Single Ply Roofing," Evansville, IN, 1981
- Urethane Foam Contractors Association National Meeting, "Use of Independent Laboratories to Evaluate Foam Workmanship," 1981
- Roofing and building maintenance seminar, "Comparison of Roofing Systems," Evansville, IN, 1980
- Urethane Foam Contractors Association, panel discussion on contractor problems such as overspray, production, and quality control, Orlando, FL, 1979

 Kimley-Horn
and Associates, Inc.

## Jeffrey A. Tarbutton, P.E.
### Failure Analysis/Forensic Engineering

### Principal Areas of Expertise

- Roofing/Coating Failures
- Structural Inspections
- Hydrology and Runoff
- Building Envelope Analysis

### Roofing/Coating Failures

- PVC roof failure, Southern Frozen Foods, Montezuma, GA
- Roofing failure, Carrier Corporation, City of Industry, CA
- Asphalt shingle failure, Newark, OH
- Exterior Insulation Finish Systems (EIFS) failures, various structures, Myrtle Beach, SC
- EPDM blow-off, Sanibel Island, FL
- Hypalon membrane failure, Huntsville, AL
- EPDM membrane, North Charleston, SC
- Roofing failure, built-up roof, National Machinery, Tiffin, OH
- Modified bitumen membrane analysis, Rockwell Industries, Kenton, OH
- Roofing failure analysis, built-up roofing, Jefferson, OH

### Structural Inspections

- Banana dock structural damage investigation, Tampa, FL
- Truss collapse analysis, Knoxville, TN
- Analysis of storm damage to wood trusses, Surfside Beach, SC
- Retaining wall failure, Norcross, GA
- Radio tower collapse, Loganville, GA
- Investigation of explosion damage to masonry walls, NC
- Collapse of steel frame barn, Erie, PA
- Analysis of tornado damage to residences, Pinellas Park, FL
- Inspection of roof and structure, precast concrete framing, Bethune, SC
- Deck collapse, wood frame, Dawsonville, GA
- Brick veneer collapse, Aaron Rents Building, Atlanta, GA
- Snowstorm and tornado damage analysis, HON Industries, Cedartown, GA
- Failure of brick pavement, AEP building, Columbus, OH
- Structural steel frame collapse, Orange, VA
- Breakage of buried service lines, Hartsfield International Airport, Atlanta, GA
- Investigation of mildew and mold damage to residences, Dayton, OH
- Fireplace analysis, residence fire, Marietta, GA
- Flooring analysis, Phipps Plaza Shopping Center, Atlanta, GA
- Blasting damage analysis, Columbia, SC
- Due diligence survey, hotel and retail complex, Coconut Grove, FL

 Kimley-Horn
and Associates, Inc.

## *Jeffrey A. Tarbutton, P.E.*
*Failure Analysis/Forensic*
*Engineering*

### *Hydrology and Runoff*
– Collapse of dam, Enterprise, AL
– Flooding of residence, Atlanta,
  GA
– Silt accumulation in pond,
  Fayetteville, GA
– Runoff damage to pond, Cobb
  County, GA
– Analysis of siltation, Conyers, GA

### *Building Envelope Analysis*
– Water entry analysis, Sheraton
  Atlantic Shores, Myrtle Beach,
  SC
– Moisture damage to decking,
  residence, Fayetteville, GA
– Brick veneer failure, Carraway
  Methodist Hospital, Birmingham,
  AL
– Moisture damage analysis in
  residence, Norcross, GA
– Storm door analysis, Norcross,
  GA
– Evaluation of storm damage to
  exterior, Hilton Hotel, Myrtle
  Beach, SC
– Analysis of siding damage,
  Alcoa, TN
– Analysis of exterior insulation
  finish systems, Wilmington, NC