IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| QBE INSURANCE CORPORATION, as subrogee of TEAGUE PROPERTIES, <br><br>   Plaintiffs, <br><br> vs. <br><br> THE ROOFING COMPANY, a corporation, MICHAEL FULGHUM, an individual, et al, <br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 3:07-cv-393-MEF<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF JEFF TARBUTTON

Come now the defendants and move the Court to issue an order excluding the opinions and testimony of Jeff Tarbutton, expert engaged by the plaintiff, and as grounds therefor show the following:

1.     The testimony and opinions of Mr. Tarbutton with regard to the cause of the roof collapse is precluded by Rule 702 of the Federal Rules of Evidence for the reason that (1) the testimony is not based upon sufficient facts or data, (2) the testimony is not the product of reliable principles and methods, and (3) Mr. Tarbutton has applied the principles and methods reliably to the facts of the case. The testimony and opinions of Mr. Tarbutton will not assist the trier of fact to understand the evidence or to determine the cause of the roof collapse.

2.    The testimony and opinions of Mr. Tarbutton are based upon speculation and conjecture and/or are based upon illegal or improper hypotheticals.

3.    Mr. Tarbutton's testimony and opinions are due to be precluded as inadmissible pursuant to Rules 401, 402 and 403 of the Federal Rules of Evidence for the reason that Mr. Tarbutton's opinions are not based upon "relevant evidence".

4.    Filed in support of this motion is a summary of the claim of the plaintiff, undisputed facts and memorandum of governing principles of law (Exhibit A).

_s/    Robert E.  Parsons_____
Robert E.  Parsons

OF COUNSEL:

PARSONS, LEE & JULIANO, P.C.
300 Protective Center
2801 Highway 280 South
P. O. Box 530630 (35253-0630)
Birmingham, AL 35223-2480
(205) 326-6600

## CERTIFICATE OF SERVICE

I hereby certify that I have on this __9th__ day of April, 2008, electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Thomas T. Gallion, III
Ms. Jamie A. Johnston
Ms. Felicia A. Long
Haskell Slaughter Young & Gallion, L.L.C.
Post Office Box 4660
Montgomery, AL  36103-4660

/s  Robert E.  Parsons_____
OF COUNSEL

# EXHIBIT A

## CLAIM OF THE PLAINTIFF

The plaintiff claims that rain water caused roofing materials or roofing debris left by the defendants to wash down to a thru-the-wall-scupper clogging or blocking the scupper and/or the 3 feet square drain box into which the scupper emptied and/or the 12 inch diameter drain pipe into which the drain box emptied. The plaintiff claims that this obstruction of the drainage system caused water to back up on the roof and that the weight of the water caused the roof to collapse. See Exhibit B - photo depicting thru-the-wall scuppers emptying into the drain box.

## UNDISPUTED FACTS

1.    There are no eyewitnesses to or other relevant and admissible evidence proving:

- The amount of rainfall;

- The amount of water that flowed down the roof to the scupper and drainage system;

- The amount of accumulation of water or "pooling" of water on the roof that collapsed;

2.    There are no eyewitnesses to or other relevant and admissible evidence proving:

- The scupper being clogged or blocked by roofing materials, roofing debris or anything else;

- The drain box or the drain pipe being blocked or clogged by roofing materials, roofing debris or anything else;

3.    The scupper made the basis of the suit fell to the floor of the warehouse when the roof collapsed and inspection of it disclosed that it was entirely clear of any debris or anything else that would impede water flowing through it.

4.    Inspection of the drain box and the drain pipe following the roof collapse did not reveal any debris or anything else that would impede water flowing through this part of the system.

5.    The plaintiff initially engaged Norman A. Johnson, roof consultant, with Norman A. Johnson & Associates, Inc. to investigate the loss. Mr. Johnson inspected the loss on August 9, 2006, the day of the roof collapse, and in his report August 11, 2006, (Exhibit C) concluded that the plaintiff's theory of liability was only *possible*. In his deposition taken February 18, 2008, Mr. Johnson testified that any conclusion that debris left by the roofers washed down and clogged the scupper or drain system would be based upon mere *speculation*. (Exhibit D, depo. pp. 29-30)

6.    Then on or about February 7, 2008, about 18 months after the collapse of the roof on August 9, 2006, the plaintiff engaged Jeff Tarbutton, a professional engineer, to inspect the site and give an opinion. Mr. Tarbutton's written opinion is attached as Exhibit E and his deposition taken February 18, 2008 is attached as Exhibit F. Mr. Tarbutton relied upon the investigation and report of Norman Johnson but attempted to advance the plaintiff's theory of liability from *possible* to *probable*.

## MEMORANDUM OPINION

The principles of law governing this motion to exclude the testimony and opinions of Mr. Tarbutton are set forth in *Browder v. General Motors Corp.*, 5 F. Supp.2d 1267 (1998) holding:

- Whether a particular witness is qualified to testify as an expert is left to the sound discretion of the trial court.

- The critical concerns of Rule 702 are evidentiary, reliability and relevancy. These concerns are addressed by the two-step inquiry articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). First, the court must determine whether an expert's proposed testimony pertains to scientific knowledge by applying the criteria suggested in *Daubert*. *Id.* at 589-90, 113 S.Ct. 2786. This requires the court to rule out "subjective belief or unsupported speculation." *Id.* at 590, 113 S.Ct. 2786. Second, the court must consider whether the testimony assists the trier of fact in understanding the evidence or determining a fact in issue. This requirement, in essence, is a relevance inquiry. *Id.* at 591-93, 113 S.Ct. 2786. The relevancy relationship between a scientific theory and facts at issue was described by the Supreme Court as one of "fit." *Id.* at 591, 113 S.Ct. 2786. The expert's opinion must "fit" the facts of the case.

- Rule 702 of the Federal Rules of Evidence requires that expert testimony "assist the trier of fact to understand the evidence or determine a fact in issue." Federal Rules of Evidence 703 requires that "the facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." As the Advisory Committee Notes make clear, facts or data upon which expert opinions are based may be derived from three sources. Fed.R.Evid., Adv. Cmte. Notes. First, is the "firsthand observation of the witness." *Id.* Second is "presentation at trial." *Id.* Third is the "presentation of data to the expert outside of court and other than by his own perception." *Id.* Tellingly, nowhere does the rule provide for an expert opinion based on sheer speculation over the

circumstances surrounding the issue upon which he or she purports to provide expert testimony.

- Basing an "expert" opinion on facts not in evidence is not helpful to the trier of fact in understanding the evidence or determining a fact in issue.

- An expert's testimony must be based on "Facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation."

- Without an underlying basis of support, the "expert's" opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence.

See also *Cooper v. Toshiba Home Tech, Corp.*, 76 F.Supp.2d 1269 (1999) and *Benkwith v. Matrixx Initiatives, Inc.*, 467 F.Supp.2d 1316 (2006).

The testimony and opinions of Mr. Tarbutton are clearly due to be excluded for the reason that his opinions are not based upon sufficient facts as requird by Rule 702 and for the further reason that his opinions do not meet the requirements of Rule 401 defining "relevant evidence".

s/    Robert E.  Parsons
Robert E.  Parsons

OF COUNSEL:

PARSONS, LEE & JULIANO, P.C.
300 Protective Center
2801 Highway 280 South
P. O. Box 530630 (35253-0630)
Birmingham, AL 35223-2480
(205) 326-6600

# EXHIBIT B



# EXHIBIT C

# NORMAN A. JOHNSON & ASSOCIATES, INC.
**Roof Consultant**

August 11, 2006

Mr. L. Burt Hacker
Hacker Claims Service
P. O. Box 926
Lagrange, Georgia 30241

Reference:
Mr. Phil Teague
Lakeview Building
545 3rd. Avenue
West Point, Georgia
Carrier: Anchor Managing General Agency
Claim Number: AWM22 976 or ANM22 976
Date of Loss: August 9, 2006

Mr. L. Burt Hacker:

At your request, I inspected the above referenced address, August 9, 2006, with you and Mr. Phil Teague, the owner, to determine:

What caused the roof to collapse?

What needs to be done to rectify the collapsed roof?

I observed the following:

Rear Portion of a Multi-Portion Roof

This rear portion of roof has a roof area of roughly 8,000 square feet.

This roof area slopes to the thru-the-wall scupper which in turn joins a large 3 foot by 3 foot roof drain, (box), in an adjoining roof area, (on the other side of a parapet wall).

This rear roof has an area which has collapsed, about 30 feet by 30 feet, located adjacent to the thru-the-wall scupper

The roof substrate and roofing consists of:

>    1" X 4'" wood plank, tongue and groove roof decking on wood rafters.

>    A tar and gravel type built-up roof.

>    One half inch Owens Corning extruded polystyrene insulation fastened to
>    the roof substrate with long screws and metal plates, (inserted through the
>    tar and gravel roof into the roof decking).

>    Applied over the roofing insulation is a single ply Stevens Roofing
>    System, Stevens EP, (TPO), (looks like a white plastic sheet).

This roof was in the process of replacement, (the last single ply membrane over
the tar and gravel roof), and about half of the roof was completed.

Apparently, the replacement roof could not be completed on the last work day.

There are still unused, (not installed), roofing materials stored on the roof, (full
rolls of roofing membrane, small rolls of roofing membrane, loose pieces of
roofing membrane, bundles of roof insulation, pieces of roof insulation, a trash
bag and etcetera laying on the roof.

The collapsed area of the roof partially exposes some of the structure below the
roofing materials.

This limited exposure does not indicate deteriorated wood decking, rafters, beams
and etcetera.

Conclusion:

In my opinion, it is possible loose roofing material, from the roof retrofitting, collected at
the only roof drain apparatus, the thru-the-wall scupper, by rain water flowing across the
roof. This water collected/backed up on this area of the roof causing this area to collapse
due to the weight of the water.

This same scenario could be said of the 3 feet by 3 feet internal roof drain box if it was
constricted or stopped up.

In my opinion, the collapsed roof structure needs to be rebuilt and this rear roof area
should be completely replaced with a new roof installation, (approximately 8,000 square
feet).

This report is accurate to the best of my knowledge and belief.

Respectfully submitted for consideration by all interested parties.

NORMAN A. JOHNSON & ASSOCIATES, INC.

Norman A. Johnson
President


NAJ/jl
Enclosures:
4 Roof Plan Sheets
29 Photographs
1 Compact Disk

# EXHIBIT D

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              EASTERN DIVISION

4

5    QBE INSURANCE CORPORATION,
     as subrogee of Teague Properties,

6
           Plaintiff,
7
     vs.                    CASE NO. 3:07-cv-393
8
     THE ROOFING COMPANY, a
9    Corporation; MICHAEL FULGHUM,
     An individual; et al.,
10
           Defendants.
11

12       *    *    *    *    *    *    *    *

13

14         The deposition of **NORMAN A. JOHNSON**

15   was taken before Cornelia J. Baker,

16   Certified Shorthand Reporter, ACCR 290, as

17   Commissioner, on Monday, February 18, 2008,

18   commencing at approximately 10:09 a.m., in

19   the law offices of Haskell, Slaughter, Young

20   & Gallion, 305 South Lawrence Street,

21   Montgomery, Alabama, pursuant to the

22   stipulations set forth herein.

23

24

25

1    Q.   Well, you, in your inspection,

2    didn't find anything that stopped up the

3    scupper, and you didn't find anything that

4    stopped up the drain?

5         A.   Correct.

6         Q.   All right.  Did you arrive at

7    an opinion as to what caused the roof

8    collapse?

9         A.   Can I ask you a question?  Did

10   you read my report?

11        Q.   I've read your report.

12        A.   Okay.  And I speculated to my

13   client that basically that's the only thing

14   that made sense.  Something stopped up the

15   drain.

16        Q.   And that was sheer speculation?

17        **MRS. LONG:**  Object to the form.

18        **THE WITNESS:**  Ma'am?

19        **MRS. LONG:**  Go ahead.

20        A.   In my opinion, it is possible

21   loose roofing material from the retrofitting

22   collected at the only roof drain apparatus,

23   the through-the-wall scupper, by rainwater

24   flowing across the roof.

25        Q.   And that's speculation, isn't

1    it, sir?

2              A.   Yes, sir.

3              Q.   All right.  And that's your

4    opinion today, as we sit here now --

5              A.   Yes, sir.

6              Q.   -- with you being under oath?

7              A.   Yes, sir.

8              Q.   All right.

9              A.   And when I say opinion, I'm

10   saying with the qualifications that it's

11   quite possible, because there is trash up --

12   maybe that's the wrong term to use, trash.

13   There's loose material up on the roof that

14   could have got to the drain and may have.

15   And I don't know whether to go any further or

16   not.  I want to talk.  I feel like I'm

17   wanting to help you.

18              Q.   Well, you are helping me.

19              A.   I'm trying my darndest to.

20              Q.   I take it you inspected the

21   roof or the part of the roof where my client

22   was working with his crew?

23              A.   Well, I'm not being a smart

24   aleck.  I don't know whose crew was there.  I

25   looked at where the place collapsed.  And I

# EXHIBIT E

 **Kimley-Horn and Associates, Inc.**


DEFENDANT'S
EXHIBIT
8
Tarbutton

*Via Email fal@hsy.com*

February 13, 2008

Felicia A. Long
Haskell Slaughter Young & Gallion, LLC
305 South Lawrence Street
Montgomery, Alabama 36104

Suite 600
3169 Holcomb Bridge Road
Norcross, Georgia
30071

> Re: Analysis of Roof Collapse
> Lakewood Building
> 545 3rd Avenue
> West Point, GA 31833
> Date of loss: August 9, 2006
> KHA Project No.: 019723000

Dear Ms. Long:

According to your letter of February 7, 2008 and our telephone conversations, I have completed an investigation of the collapse of a roof at the Lakeview Building, at 545 Third Avenue, West Point, Georgia. The roof collapsed August 9, 2006. The following is a summary of my findings.

**Background Information**

The subject building is owned by Mr. Phil Teague. It is an old, wood-framed building and appears to have been utilized principally as a warehouse.

At the time of the collapse, the building was being re-roofed, which I understand was necessitated by hail damage to several sections of the roof on the building. The roofing work was being done by Mr. Mike Fulghum d/b/a The Roofing Company.

The building essentially has four different sections. There is a large western section, which borders three smaller sections on the eastern end of the building. Three of four sections on the roof were covered with a white polymer membrane material. The fourth section of the building was covered with a painted corrugated metal roof. The metal roof section was at the southeast part of the building. The north slope of the metal roof section, the two easterly membrane-covered roofs, and the western section of the building all drained to a sump or drain box which is located near the center of a wall which

TEL  770 825 0744

FAX  770 825 0074



divides the western section of the roof from the other three sections.  Thru-wall scuppers allow water from the western slope and the northeastern section of the roof to drain to the drain box.  The central section of the roof, above the area of the loading dock, drains westerly toward the drain box but does not pass through a scupper.

Following the collapse, it was investigated by Mr. Norman A. Johnson, of Norman A. Johnson and Associates, Inc. who viewed the site August 9, 2006, on the date of loss. A subsequent investigation was performed by S.E.A. Limited of Lawrenceville, Georgia, and was based on a site visit performed November 8, 2006 by Mr. Dan Sheehan, P.E.  As part of our investigation, I reviewed these reports.

### Summary of Findings

The following summarizes my most significant observations and conclusions regarding the loss.

- I conducted a site visit February 11, 2008, at which time I made a visual and photographic survey of the affected portion of the building.
- I photographed the debris field in the area where the roof had collapsed, and removed portions of the debris to expose a wood post which had been approximately in the center of the collapsed area.
- I took rough measurements of the building, to allow for an estimate of the roof area and associated drainage required.
- Selected photographs from the site visit are appended for your review and file.  There are additional photographs which I took, which will remain on file for future reference, if needed.
- The orientation of the collapse is consistent with a ponding-induced failure.  As noted in the reports by S.E.A. and Johnson, the polymer roof was being replaced on the building.  The replacement procedure included the removal of a white polymer membrane, which had been installed over the old gravel surface built-up roof over a white, expanded polystyrene recovered board.  The new roof also incorporated a white polymer membrane, and was being installed over the old gravel surface built-up roof following removal of the original polymer roof and its underlying layer of insulation. This original layer of insulation was a ½ inch (approx.) layer of white, expanded polystyrene.
- The new membrane is a "TPO" membrane manufactured by Stevens Roofing Systems.  It was being installed, as noted above, over a new layer of insulation, a pink-colored layer of extruded polystyrene. According to the S.E.A. report, dated February 27, 2007, "this is a common and acceptable roofing practice which resulted in very little additional weight being placed on the existing roof structure."  I agree with this viewpoint.
- Sheehan's report also states that the roof "had numerous leaks that were repaired by the re-roofing process" and goes on to suggest that "pre-existing holes were essentially acting as additional drains". I do not agree with this assertion by Mr. Sheehan. The warehouse below the



west end of the was being used, according to Phil Teague, to store numerous cardboard boxes containing cushions for patio furniture, and was not affected by "numerous leaks", and certainly not heavy leakage which may have served as "drains".

- According to the Johnson report, dated August 11, 2006, "it is possible loose roofing material, from the roof retrofitting, collected at the only roof drain apparatus, the thru-the-wall scupper, by rain water flowing across the roof". According to Johnson, the associated accumulation of water on the roof caused the collapse.

- According to Sheehan, "no evidence" had been shown that debris from the roofing project had clogged the roof drain, and states "the physical evidence showed that the scupper was, in fact, open and functional at the time of the collapse." It appears to me that the scupper was, in fact, "open and functional", but this is quite different from saying that it was not also obstructed by debris. This statement also ignores the fact that, once the roof collapsed, the rapid flow of water from its surface would have the effect of removing, or at least relocating, debris which may have previously obstructed the scupper. It is also of some importance to note that neither Sheehan nor Johnson documented the condition of the drain immediately downstream of the drain box or sump adjacent to the central wall.

- As noted, the orientation of the debris field is consistent with what I would expect from a roof collapse caused by ponding. Two overall views of the collapse area are shown in Photos 1 and 2. These views are both taken from the west, facing the wall through which the scupper drains to the drain box. The drain box, as referred to in the Johnson report, is about a three foot square low point in the roof adjacent to the east side of the parapet wall which separates the westerly and easterly sections of the roof .

- The galvanized steel scupper box which had originally been in the short wall above the roof had fallen toward the floor with the collapse (Photo 3).

- I removed part of the collapse debris in order to expose and view the post which had been essentially in the center of the collapsed area. It is of note that the post was heavily deteriorated and had been severely compromised by termite damage. The base of the post is shown in Photo 4, and a close-up view of the base of the post is shown in Photo 5. An overall view of the final position of this post following the collapse is shown in Photo 6.

- The damage to the post extended several feet above the floor line; it could be directly observed in a wide split or opening in the face of the column (Photo 7).

- A view from the roof clearly shows how the section of the roof which collapsed had been sloped toward the scupper which penetrated the wall separating the western and eastern sections of the building (Photo 8). The drain box and the attached drain pipe were adjacent to the eastern side of this parapet wall. A view of the drain box is shown in Photo 9.

- During my site visit, I observed that there were several pieces of white expanded polystyrene insulation board which had accumulated in the large drain box. This white polystyrene board

 Kimley-Horn
and Associates, Inc.

stock was the material used in the original polymer membrane roof, which was in the process of being replaced when the collapse occurred. I removed these larger pieces of the polystyrene board, to observe the condition of the transition from the drain box to the attached 12-inch diameter drain pipe extending from it.

- There were many pieces of the white polystyrene insulation which had become lodged in the drain pipe. These are clearly shown in Photos 10 thru 12, which I took as I removed additional pieces of the polystyrene. The presence of white polystyrene segments in the drain box and in the upper end of the drain pipe had certainly compromised the drainage capacity of this system.
- The drain box was provided with a transition which connected to a 12-inch pipe. The 12-inch pipe ran laterally, then turned down and continued vertically in a small office near the parapet wall, and subsequently connected to a horizontal drain pipe. This pipe discharged into an old, open brick catch basin and to an underground pipe which conveyed the roof drainage away from the building.
- Following my site visit, I calculated the capacity of the scupper to drain the water from the west end of the roof. My analysis indicates that the scupper had more than twice the required capacity, assuming it was not blocked or obscured by roof debris. Sheehan's report states that the roofer reported that "the debris was removed from the roof and that the scupper was open." If these assertions are correct, they beg the question of just how the water rose to a depth sufficient to collapse the roof. The photos by Johnson, furthermore, clearly show that not all the debris was removed from the roof.

### Analysis and Conclusions

On the basis of my observations, and the information summarized above, I offer the following conclusions.

1. The collapse which occurred at this building was due to ponding on the roof, which overloaded the eastern side of the west section of the roof.
2. Current code provisions require that roofs like this be provided a back-up or emergency drain. No such drain was provided for this roof. This was an open and obvious condition, and should have been noted by the roofer. It was very important that the scupper be maintained by the roofer at all times so that its capacity would not be compromised by trash or debris.
3. The capacity of the scupper detail as found was adequate for the intended rainfall. In the absence of some type of blockage or obstruction, the scupper and associated drain should have provided adequate runoff capacity to prevent the collapse.
4. The wood post in the area where the collapse occurred had been compromised by long term termite damage. The top of the post also had been provided with a nearly one-foot long shim or spacer, and about a third of the cross section of this shim had also been compromised by termite damage. The condition of the post, however, though compromised, had remained in



place and had suitably supported the roof loads until the time the re-roofing work was underway. Its pre-loss condition influenced, but did not cause, the collapse.

5. It should also be noted that the progression of the roof work was from east to west, and actually had been started along the east side of the west section of the roof. Accordingly, therefore, the roofing contractor had been working directly on and had passed over the area which later collapsed. This certainly suggests the roofer had not considered the roof to be unsafe for his workers or for the placement of materials.

6. In my opinion, the drainage on this roof, even though it lacked provision for emergency drainage, should have been adequate to drain this roof effectively had not either (1) the scupper been obstructed or compromised by roof debris becoming trapped in the upstream side of the scupper or (2) the drain pipe gotten blocked by the polystyrene fragments within it. I believe that one, and perhaps both, of these factors caused the collapse.

7. In my opinion, the presence of a number of small pieces of the white polystyrene within the roof drain indicates that debris from the roof had found its way to the drain box, which necessarily came from the work being done to replace the roof. Accordingly, therefore, the possibility is that not all the insulation fragments passed freely through the scupper, but may have gotten stuck or somehow restrained on the upstream (west) side of the scupper, obstructing the drainage and causing the collapse. Once the roof collapsed, of course, there should have been no further accumulation of the expanded polystyrene fragments within the drain box, but, at the time of my site visit, there were many small pieces lodged at the upper end of the drain pipe. In my view, this is an indication that roof debris had compromised the capacity of the scupper and/or drain, leading to the loss.

8. It is also possible that the scupper was blocked by a cardboard box(es). Johnson's photos clearly show boxes in the collapse debris which are different from the boxes stored in the warehouse by the insured.

9. I also note that the photos Mr. Johnson took do not show any sections or pieces of the expanded polystyrene in the large, upper portion of the drainage box, but neither Johnson nor Sheehan observed or reported any smaller fragments of the polystyrene which had gotten downstream of the box, and had lodged in the upper end of the pipe drain. There were, however, several larger pieces of the white insulation in the box when I observed it, thus some of the insulation had continued to break off and find its way to the box following the loss.

10. It is also a fact that the some of the larger pieces of the polystyrene which were eventually were found in the drain box were apparently not there at the time Mr. Johnson investigated the roof collapse. Following the loss, however, the remnant edge of the original polymer roof, which was in the process of being replaced, had been left with the edges of the white polystyrene insulation exposed to the weather. I believe it is possible that some of the polystyrene had become dislodged from that part of the roof since the loss and had perhaps been blown across



the roof and subsequently landed on or had been washed into the drain box. I also consider it very unlikely, however, that the numerous smaller pieces found inside the box and near the top of the pipe had all accumulated in the pipe following the loss.

In my opinion, this collapse was the result of ponding. I believe the ponding was caused by debris from the re-roofing work which got trapped or somehow stuck on the upstream (west) side of the scupper, compromising the capacity of the scupper. It also appears that polystyrene fragments from the old membrane roof had gotten lodged in the pipe drain extending from the drain box. The pre-loss condition of the scupper and drain and the lack of emergency overflow provisions were readily observable and should have been considered by the roofer.

I also acknowledge that the post in the center part of the collapse had sustained damage prior to the loss, but this pre-loss damage did not cause the collapse. It did influence the progression of the collapse and the resulting orientation and condition of the debris. This collapse would not have occurred unless the drainage capacity had been compromised during the re-roofing work.

This concludes my investigation of this roof collapse. Please do not hesitate to contact me if you have any further questions or comments. I have attached selected photographs for your review and file. Thank you for the opportunity to be of service.

Very truly yours,

KIMLEY-HORN AND ASSOCIATES, INC.

Jeffrey A. Tarbutton, P.E.

Enclosures: 12 Photographs

# EXHIBIT F

Jeff Tarbutton
February 18, 2008

---

3

1    * * * * * * * *
2
3         STIPULATIONS
4
5         It is hereby stipulated and
6    agreed by and between counsel representing
7    the parties that the deposition of JEFFREY
8    ALAN TARBUTTON is taken pursuant to the
9    Rules of Civil Procedure, and that said
10   deposition may be taken before Cornelia J.
11   Baker, Certified Court Reporter, as
12   Commissioner, without the formality of a
13   commission; that objections to questions,
14   other than objections as to the form of the
15   questions, need not be made at this time,
16   but may be reserved for a ruling at such
17   time as the deposition may be offered into
18   evidence, or used for any other purpose by
19   either party hereto, provided by the
20   Statute.
21        It is further stipulated and agreed by
22   and between counsel representing the parties
23   in this case, that the filing of the
24   deposition of JEFFREY ALAN TARBUTTON is
25   hereby waived, and that said deposition may

---

5

1    * * * * * * * *
2         I N D E X
3
4    EXAMINATION              PAGE
5    BY MR. PARSONS:            11
     BY MRS. LONG:             71
6
7    EXHIBIT                  PAGE
8    Defendants' Exhibit No. 8 ......... 49
9    Defendants' Exhibit No. 7 ......... 71
10   Plaintiff's Exhibit No. 6 ......... 72
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1    be introduced at the trial of this case or
2    used in any other manner by either party
3    hereto provided for by the Statute,
4    regardless of the waiving of the filing of
5    same.
6         It is further stipulated and agreed by
7    and between counsel and the witness that the
8    reading and signing of the deposition by the
9    witness is hereby waived.
10
11   * * * * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

6

1         MR. PARSONS:  The Defendants
2         object to Jeffrey A.
3         Tarbutton, professional
4         engineer with Kimley-Horn
5         and Associates, Inc., being
6         identified or called as an
7         expert witness in this case
8         for the following reasons:
9         On August the 8th, 2007,
10        Honorable Mark E. Fuller,
11        Chief United States
12        District Judge for the
13        United States District
14        Court for the Middle
15        District of Alabama issued
16        a uniform scheduling order
17        which provided, and I
18        quote, The Court has
19        adopted a new scheduling
20        order in light of the
21        amendments to the Federal
22        Rules of Civil Procedure,
23        which became effective on
24        December 1, 2000.  Please
25        read this order carefully.

---

Jeff Tarbutton
February 18, 2008

7

1　　The deadlines and
2　responsibilities may not be
3　changed without leaving the
4　Court. All parties are
5　expected to comply with
6　each and every provision of
7　this order in a timely
8　manner and extensions will
9　be granted in only
10　extraordinary, unfore-
11　seeable circumstances. The
12　parties are also expected
13　to comply with the Middle
14　District's local rules and
15　the Middle District's
16　guidelines to civil
17　discovery practice, both of
18　which can be found at --
19　and it gives the web site.
20　　Now, Section 8 of
21　that uniform scheduling
22　order provides, quote, that
23　parties shall disclose to
24　each other the identity of
25　any person who may be used

8

1　at trial to present
2　evidence under Rules 701,
3　702, 703, or 705 of the
4　Federal Rules of Evidence
5　and provide the reports of
6　retained experts or
7　witnesses whose duties as
8　an employee of the party
9　regularly involved giving
10　expert testimony required
11　by Rule 26(a)(2) of the
12　Federal Rules of Civil
13　Procedure.
14　　Now, this disclosure
15　was ordered to be obeyed by
16　the Plaintiff not later
17　than December 14, 2007.
18　Further, this is Monday,
19　February the 18th, and I
20　received a copy of
21　Mr. Tarbutton's report
22　dated February 13, 2008. I
23　read it today here in the
24　law offices of the
25　Plaintiff.

9

1　　Now, I learned today
2　that this report had been
3　sent to me by e-mail, but I
4　want the Record to reflect
5　that it was not sent to me
6　by e-mail until Friday,
7　February the 15th. I
8　checked with my office
9　today and learned that the
10　report had indeed reached
11　my office, but it did not
12　get there until Friday,
13　February the 15th, and I
14　had already left for the
15　weekend and came here from
16　Alexander City for these
17　depositions.
18　　So it is the
19　position of the Defendants
20　that this gentleman cannot
21　be called as an expert and
22　that his report cannot in
23　any way be used or offered
24　into evidence, because the
25　Plaintiff is far out of

10

1　time with regard to
2　complying with the Court's
3　scheduling order with
4　regard to identification of
5　experts.
6　　And with that, I'm
7　ready to proceed unless you
8　have anything you want to
9　say on the Record.
10　MRS. LONG: And I'll just
11　clarify one thing. The
12　expert report was e-mailed
13　to the attorney for the
14　roofing company on Friday
15　at 12:26 p.m.
16　MR. PARSONS: That's what my
17　office reports.
18　JEFFREY ALAN TARBUTTON,
19　The Witness, having first been sworn or
20　affirmed to speak the truth,
21　the whole truth, and nothing but the truth,
22　testified as follows:
23　(All parties agreed to usual
24　stipulations.)
25

Jeff Tarbutton
February 18, 2008

---

11

```
 1            EXAMINATION
 2   BY MR. PARSONS:
 3        Q. Sir, would you state for the
 4   Record your full name and occupation?
 5        A. It's Jeffrey, R-E-Y, middle
 6   name is Alan, A-L-A-N, Tarbutton.
 7        Q. Sir, when were you first
 8   contacted about this case?
 9        A. It was a few days. It was
10   probably late the week of -- first week of
11   February. I have a letter dated February 7
12   which I believe had been previously e-mailed
13   to me. But on or about February 7th, 2008.
14   It's Mr. Parker, right?
15        Q. Parsons.
16        A. Parsons. I'm sorry.
17        Q. And what's the date of the loss
18   made the basis of this suit?
19        A. I understand it's August 9,
20   2006.
21        Q. Do you have any understanding
22   as to why you were not contacted until
23   February the 7th, 2008, when the loss
24   occurred August the 9th, 2006?
25        A. No, sir. That's completely out
```

12

```
 1   of my control.
 2        Q. In the past, have you had
 3   occasion to do work for this law firm,
 4   Haskell, Slaughter?
 5        A. Not that I recall.
 6        Q. In the past, have you had
 7   occasion to do work for QBE Insurance
 8   Corporation?
 9        A. Not that I know of. Now,
10   sometimes, as you're well aware, there's
11   several layers of people in the process. But
12   I don't know whether I've actually done that
13   or not.
14        Q. Who contacted you?
15        A. Mrs. Long of this firm here.
16        Q. Was that initial contact by
17   telephone?
18        A. Yes, sir.
19        Q. What did she say in that
20   telephone conversation and what did you say?
21        A. She asked me if I would be
22   willing to take a look at a roof collapse in
23   West Point, Georgia. She said that it had
24   been previously viewed by some other
25   investigators. And that they were on a short
```

13

```
 1   time frame, and would I be willing to do
 2   that, to get a report to them and be
 3   available for deposition today. That was the
 4   gist of it.
 5        Q. So when you were contacted, you
 6   were asked to make an investigation and give
 7   a report so that you would be available to
 8   give your deposition today, February the
 9   18th; is that correct?
10        A. That was the schedule given to
11   me at that time, yes, sir.
12        Q. Now, what did you do after you
13   received that call from Mrs. Long?
14        A. Well, I reviewed what she had
15   sent me.
16        Q. What did she send you and what
17   did you review?
18        A. She sent me a letter, of
19   course. And she sent me copies of reports
20   and a CD that had several things on it, the
21   photographs and reports that had been taken
22   by Mr. Norman Johnson, Norman Johnson and
23   Associates in Decatur, Georgia. And I got a
24   copy of a February 21, 2000, letter authored
25   by Mr. Dan Sheehan of SEA. I guess they go
```

14

```
 1   by Limited now. SEA, Inc., in Lawrenceville,
 2   Georgia. And that's what I got.
 3        Q. Do you know Dan Sheehan?
 4        A. Yes, sir.
 5        Q. What's the basis or history of
 6   your knowing Dan Sheehan?
 7        A. I hired him to come work with
 8   me at my previous employer. And then he and
 9   I have crossed paths in various projects
10   since that time.
11        Q. You hired him with what
12   company?
13        A. SEA. I was working for SEA at
14   that time. And so when Dan Sheehan joined
15   SEA, I had undertaken the initial interviews
16   and had recommended -- I didn't personally
17   have authority to hire or fire anybody. I
18   recommended that we hire him at that time,
19   and we did.
20        Q. And he's still with SEA; is
21   that correct?
22        A. Yes, sir, he is.
23        Q. But you're not?
24        A. That's correct.
25        Q. How long were you with SEA?
```

Jeff Tarbutton
February 18, 2008

15

1      A. About fourteen years.
2      Q. Why did you leave SEA?
3      A. I got canned, fired.
4      Q. Well, why were you fired?
5      A. They didn't like how I did
6 things very well. There were a few, shall we
7 say, irritations and complaints that I had.
8      Q. Who fired you with SEA?
9      A. One of the owners, Mr. Glenn
10 Baker. That's two Ns. Baker, I think.
11      Q. Did Dan Sheehan have anything
12 to do with your being fired?
13      A. Not that I know of. I don't
14 think so. I don't think he did at all, but I
15 don't honestly know. He was never
16 implicated, shall we say.
17      Q. Well, while you were with SEA
18 for those fourteen years, how much of that
19 time was Dan Sheehan a co-worker?
20      A. I don't remember exactly when
21 we hired him, Mr. Parsons. It would be easy
22 enough to find out, but I don't recall.
23      Q. About how many years?
24      A. A year or two perhaps. And
25 that's surely a guess.

16

1      Q. So for one or two years,
2 about --
3      A. Yes.
4      Q. -- the two of you worked
5 together at SEA?
6      A. We did.
7      Q. During that one- or two-year
8 period of time, did you have any problems
9 with Dan Sheehan or did he have any problems
10 with you; was there any kind of professional
11 differences or professional jealousy or any
12 kind of animosity for any reason whatsoever?
13      A. No. Actually, I considered
14 then and I do now consider Dan a very
15 professional and responsible engineer. And I
16 consider him as a personal friend as well. I
17 think Dan is a good man, and I think he's a
18 solid engineer.
19      Q. And you've read his report?
20      A. I have.
21      Q. And would it be true that it's
22 your assessment that his report is based upon
23 professional and responsible engineering,
24 although you may disagree with him?
25      A. That would be correct, yes.

17

1      Q. All right. Now, I want to --
2 we'll copy it later, but I want to have your
3 file marked as Exhibit A. And we'll make a
4 copy of it and introduce it into evidence.
5      Now, did you review those file
6 materials in front of you before you went to
7 the building?
8      A. Yes.
9      Q. When did you go --
10      A. Mr. Parsons, I'm sorry. I know
11 that I reviewed all of the things that I got
12 that Norman Johnson had authored. And I just
13 don't remember right this minute whether I
14 looked at the report from Dan Sheehan before
15 or after I got back. At this point, I just
16 don't remember. Either just prior to or
17 shortly thereafter.
18      Q. In the past, have you worked
19 with Norman Johnson?
20      A. I have.
21      Q. On many occasions?
22      A. Oh, let me think. Probably a
23 half a dozen times or so scattered over about
24 a ten-year period.
25      Q. And are you aware that his

18

1 discipline is that of being a roof
2 consultant?
3      A. Yes, sir, I know that.
4      Q. Do you have an opinion or
5 assessment of him as a roof consultant in
6 terms of being responsible, being
7 professional, being competent?
8      A. I have felt like he's
9 competent. I would say he's a little less
10 conservative -- I mean, no, no. I'm sorry.
11 Let me back up.
12      I think Norman is a little more
13 conservative than I am, just philosophically.
14 But I have always felt like he's done a
15 professional job. I have to qualify my
16 answer for the simple point of I'm sure
17 Norman does a lot of investigations that are
18 purely having to do with the roof itself.
19 And I don't know what he does. I don't know
20 anything about the nature of his work as it
21 might relate to a reroofing specification or
22 if he writes the reroofing specifications in
23 the general sense. Most of my contact with
24 Norman would be something like this where he
25 needs additional assistance or has asked for

6 (Pages 15 to 18)

f8db266c-66e6-4532-a536-4dd87a42774c

Jeff Tarbutton
February 18, 2008

19

1   the assistance of somebody who's an engineer
2   like me. He and I have worked on roofs
3   together at the request of the insurance
4   carriers on one large loss up in the west
5   side of Atlanta.
6           My answer to your question is
7   that basically in my dealing with Norman
8   Johnson, he's been professional and been fair
9   minded about what he said and his
10  conclusions. But the only qualification I
11  would make is I have a very limited exposure
12  to Norman's work outside of specific things
13  where an engineer's additional training may
14  be required.
15          Q. Now, you read Norman Johnson's
16  report, right?
17          A. Yes, sir.
18          Q. And did you see in his report
19  that with regard to the cause of the roof
20  collapse, in his opinion, it was only
21  possible that debris blocked the scupper
22  causing water to back up?
23          A. I think the operative word was
24  may. I think he used the word "may." I did
25  notice that. I sure did.

20

1           Q. Well, look at his report and
2   see if he didn't say possible.
3           (Witness reviewed document.)
4           A. Oh, yeah. You're exactly
5   right. My bad. He said it is possible.
6           Q. All right.
7           A. So, yes, I saw that.
8           Q. Okay. And you disagree with
9   his conclusion, don't you?
10          A. No. Certainly, I would say it
11  was possible. But I went to the next level
12  above that and said I think it's probable.
13          Q. All right. Well, you disagree
14  with him in the sense that you went to the
15  next level, which is probable?
16          A. I think it's probable, yes,
17  sir.
18          Q. Okay. And are you aware that
19  that's the level where you have to be in
20  order for your opinion to be admissible into
21  evidence?
22          A. I certainly do.
23          Q. All right. So you're aware in
24  your profession that possible doesn't get it,
25  that it's got to be probable or more likely

21

1   than not?
2           A. Within a reasonable degree of
3   engineering certainty I think is the catch
4   phrase they use in Georgia, but I'm not
5   trying to interpret the law. Yes, sir, I
6   understand that perfectly.
7           Q. Here you get this assignment
8   and there are two experts that have looked at
9   this case, Norman Johnson, who says the
10  collapse is only possible, and there's Dan
11  Sheehan who was of the opinion, in so many
12  words, that the collapse wasn't because of
13  any act or omission on the part of my client;
14  in other words, that it wasn't a result of
15  blockage of the drain of the scupper causing
16  accumulation of water?
17          A. He said the allegation of
18  blockage was unsubstantiated.
19          Q. Okay.
20          A. And that there was no evidence
21  for it. But that's fine. That's his
22  viewpoint on it.
23          Q. All right. So when you come
24  onboard, there are two experts that, in so
25  many words, are of the opinion that there's

22

1   no proof that there was fault on the part of
2   my client, right?
3           MRS. LONG: Object to the form.
4           A. I wouldn't argue with you about
5   whether they'd say proof or not. I happen to
6   think Norman was on the right track. I'll
7   move it up a notch and say that he was on the
8   right track. I happen to disagree. I think
9   there's at least one factual shortcoming in
10  the Sheehan report. We can certainly get
11  into that later. I recognize there's other
12  guys that don't have my opinion. I'm very
13  comfortable with that.
14          Q. When you were hired this month,
15  were you told that there were two expert
16  opinions that did not support the Plaintiff's
17  lawsuit and for that reason you were being
18  brought in to see if you would come up with a
19  different opinion?
20          A. No. That was never -- I was
21  never told that. I was told that there was
22  some question about what caused this collapse
23  and would I go down and make an independent
24  decision about that collapse. I was never
25  told that the Plaintiff's case hinged upon

Jeff Tarbutton
February 18, 2008

23

1  the outcome of my investigation, but I
2  certainly recognize -- I do this kind of work
3  all the time. I certainly recognize that
4  that might have been used for that. But I
5  was not told to go down and find some reason
6  or find some excuse, shall we say for lack of
7  a better term, that just because these two
8  guys had slightly different conclusions that
9  I was supposed to go down there and make a
10  third conclusion. I was encouraged to go
11  down and make an independent assessment and
12  make my own conclusions based on whatever
13  information they would provide me and on my
14  own observations.
15       Q. What do you charge for your
16  services?
17       A. It's, I think, 225 an hour or
18  215 per hour. Honestly, it just changes, so
19  I don't remember the number.
20       Q. How much have you charged to
21  date?
22       A. I don't know, sir. Somewhere
23  around eighteen or twenty hours, plus
24  whatever I have today.
25       Q. Well, if you're charging $225

24

1  per hour and you've going to have about
2  thirty hours in the case, does that mean you
3  have about $6,750 to date?
4       A. Sure, yeah.
5       Q. And who's paying that?
6       A. I've been asked to send all of
7  the invoices through the law firm,
8  Mrs. Long's office.
9       Q. Have you been paid anything
10  yet?
11       A. I haven't billed anybody
12  anything yet.
13       Q. Do you plan on billing?
14       A. Well, no -- absolutely.
15       Q. All right. Now, is it true
16  that you were to do a site visit February the
17  11th?
18       A. That's the last Monday?
19       Q. Yeah.
20       A. Yes, sir. That's true,
21  correct.
22       Q. So that was one week ago?
23       A. One week ago today, yes, sir.
24       Q. All right. Now, is it your
25  opinion that pooling or an accumulation of

25

1  water on the roof caused the collapse?
2       A. It is.
3       Q. Now, we have several segments
4  of the roof; is that right?
5       A. That's correct.
6       Q. And the segment that collapsed
7  feeds into a scupper; sometimes people call
8  it a little something else?
9       A. Yes. Through a wall scupper if
10  you're referring to a rectangular -- in this
11  case, a rectangular opening that goes
12  actually through a short wall.
13       Q. Right.
14       A. Correct. It does.
15       Q. And is it true that that's the
16  only part of the roof that we're dealing
17  with, the part that collapsed and the scupper
18  that water fed into from the part of the roof
19  that collapsed?
20       A. As far as I'm concerned, yes,
21  sir, because there's no other structural
22  issues. Let me say that differently.
23  There's no evidence of other structural
24  damages or collapse going on in other parts
25  of the building. It's to be the western

26

1  section. And the collapsed part is the
2  eastern end of the western section.
3       Q. Now, when you got there, did
4  you go up on the roof?
5       A. Sure did, yes, sir.
6       Q. When you went up on the roof,
7  what did you observe?
8       A. Big hole in the roof.
9       Q. All right.
10       A. And there's -- the basic thing
11  that's going on is there's relatively new --
12  what's called a TPO. Or it's a white polymer
13  membrane which I understand Mr. Fulghum's
14  company was installing. And then there's an
15  old membrane which may also be TPO, but I
16  don't know that. There's several different
17  polymer roofs that look like that. So there
18  was a remnant portion of that old roof which
19  had been damaged rather badly by hail on the
20  western side or the western limit of the
21  western section of the roof. And then there
22  was an open area between those two where the
23  exposed edge of the old membrane roof had
24  been left, of course, unsealed. Because at
25  that time, they had left the site and had not

Jeff Tarbutton
February 18, 2008

27

1   completed that work.
2         And there's, of course, a large
3   gaping hole in the eastern end of the roof
4   where it meets the wall. And then the
5   scupper and the drain or drain boxes -- no,
6   let's don't call that a scupper. I'll limit
7   the scupper term for the thing that goes
8   through the wall. And then on the -- just on
9   the immediately eastern side of that little
10  wall where the scupper is, it's been termed
11  or referred to as a drain box. And then
12  that's basically what you can see from the
13  roof.
14        In addition to that, I viewed
15  the outlet of that box on the pipe and found
16  a number of pieces of polystyrene which had
17  been wedged into the upper end of the 12
18  inch -- it's a 12-inch diameter pipe drain
19  that carries the water from that western
20  section -- well, really from all of the roof
21  except for part of the slope roof. And that
22  carries the water down to an old drain under
23  the building.
24        Q. Now, would there be two
25  scuppers that empty into that 12-inch drain?

28

1         A. There's two. At least two.
2   There are two, sir, yes.
3         Q. All right. But we're only
4   dealing with one scupper outlet in this case;
5   is that right?
6         A. As far as I'm concerned. We
7   only have the one section of collapse.
8         Q. Before the occasion of the
9   collapse, what was the construction of the
10  scupper outlet, if you know?
11        A. Oh, it was similar to what --
12  it appeared to have -- well, let me back up.
13        Before the loss, it was
14  similar -- no. I'm sorry. Let me back up.
15  That's not correct. I started to say it was
16  coated or covered with a membrane. But I
17  don't know that, because I believe the
18  membrane that's in the photographs is the new
19  membrane.
20        And then there was a galvanized
21  steel box that had been used to form the
22  scupper. That had been in the wall, and it
23  was down in the collapsed debris. And prior
24  to the loss, my -- I don't know specifically
25  whether they had gone ahead by then and had

29

1   replaced the membrane on the interior of the
2   scupper or not, but the metal box had been
3   there. My working assumption is that it had
4   been similarly finished, the way that it was
5   when I got there, which would have been to
6   cover the inside perimeter of the scupper
7   opening with the membrane material.
8         Q. Well, did you find that the
9   metal box that was, I guess, the essential
10  part of the scupper made the basis of this
11  suit, had come loose and was on the floor of
12  the building?
13        A. It was on the floor of the
14  building and in the early pictures. It was
15  still there when I looked at it -- well, let
16  me back up. It was up in the debris. It had
17  not reached the floor.
18        Q. All right. Did you inspect
19  that steel scupper box?
20        A. Just generally. I looked at
21  it, sure. But I didn't inspect it per se,
22  just noticed that it was open and it was
23  still --
24        Q. There was no debris in it, was
25  there?

30

1         A. Oh, no. I wouldn't expect any.
2         Q. Okay. Now, if I understand
3   your opinion and finding, when this rainstorm
4   came, there was debris or something on the
5   roof that came down and blocked the scupper
6   so that water could not flow through the
7   scupper into the drain, and that that water
8   backed up on the roof and the weight of that
9   water caused the roof to collapse; is that
10  your opinion or not?
11        MRS. LONG: Object to the form.
12        A. Yeah. That's pretty close.
13        Q. Now, of course --
14        A. I mean, that's not pretty
15  close, that's what I believe.
16        Q. Okay. Now, that belief has to
17  be based on an assumption, right, the
18  assumption being that debris came down and
19  blocked the scupper?
20        A. Yes. That's an assumption.
21        Q. You were not an eyewitness to
22  any debris getting up against the scupper,
23  were you?
24        A. Oh, no.
25        Q. And would it not also be true

Jeff Tarbutton
February 18, 2008

---

31

1    that you have not interviewed any witness
2    that has told you, I saw debris blocking that
3    scupper to the point that water backed up on
4    the roof?
5           A.   I have not interviewed any
6    witness that said that. That's correct.
7           Q.   All right. Okay. Now, before
8    the occasion of this collapse, you don't know
9    what was on the roof, what was on that part
10   of the roof that may or may not have impaired
11   flow of water to the scupper?
12          A.   Well, there's some items in the
13   debris. It was very much -- well, let me
14   back up.
15          There were some items of debris
16   when I get there, which is several months, of
17   course, more than a year after the collapse.
18   And there's several items documented in the
19   collapsed debris following the collapse that
20   Mr. Johnson identified. And then Mr. Johnson
21   also identified materials on the roof itself.
22   So based on that, I do know some of the
23   things that were up there.
24          Q.   Well, you know that from these
25   reports that you've read?

---

32

1           A.   I know that from the
2    photographs that have been given to me taken
3    right after the collapse.
4           Q.   But including the photographs?
5           A.   Oh, certainly.
6           Q.   But didn't most of those
7    photographs show rolls of roofing and also
8    stacks of insulation?
9           A.   I don't remember the stacks of
10   insulation per se or off the top of my head.
11   Certainly, there are rolls of the membrane up
12   there. It does show those up there.
13          Q.   Well, assuming those rolls of
14   roofing weigh about 140 pounds, would you
15   agree with me that rainwater would not wash
16   those rolls down to block the scupper?
17          A.   I wouldn't expect those rolls
18   to block the scupper. That is correct.
19          Q.   Okay.
20          A.   It's also to be noted, however,
21   that if you get a very heavy rainfall and
22   you've got a pretty good slope on the roof,
23   which they do -- oh, no. I don't think those
24   things -- I think those are heavy enough that
25   I do not believe that the rolls themselves

---

33

1    came over and blocked the scupper. I don't
2    think that happened.
3           Q.   Would you agree that those
4    stacks of insulation that you see in the
5    photographs would not move to a point where
6    they would block the scupper?
7           A.   Mr. Parsons, I don't see any
8    stacks of insulation in the photographs. So
9    I don't know the answer to that question. I
10   don't see any stacks, actual stacks,
11   unless . . .
12          (Witness reviewed photographs.)
13          A.   I'm looking at Mr. Johnson's
14   photographs. Let me answer the question this
15   way if this helps -- okay. There's one right
16   there. I was trying to see where that was.
17          Q.   Let me show you Photograph
18   No. 21. And I think you can see stacks of
19   the insulation.
20          (Witness reviewed photograph.)
21          A.   Yes, you can. I would not have
22   expected the stacks of insulation to have
23   shifted over to that -- well, that photograph
24   is taken immediately after the collapse.
25          Q.   Right.

---

34

1           A.   So obviously those stacks of
2    insulation did not shift into here. Okay, I
3    do have a photograph that shows more that I
4    can compare those to. Yeah, I don't think
5    those stacks of insulation moved.
6           Q.   Well, then, what are you saying
7    blocked the scupper?
8           A.   My best estimate of that is in
9    the debris photographs taken by Mr. Johnson,
10   there are -- well, I will qualify my answer
11   this way, and that is once you get a ponding
12   collapse like this was and the water is
13   released, it comes suddenly and rapidly. So
14   it's not hard to argue that it carries some
15   things away from the point of the origin of
16   the problem, which might have been useful
17   information had they only stayed close by.
18          I believe that in the
19   photographs that Mr. Johnson had taken, that
20   there are a couple of -- there are two boxes,
21   two cardboard boxes in the debris. Those
22   cardboard boxes are not the same type and
23   they're not the same color as the boxes that
24   Mr. Teague -- Teague, is right, correct?
25          Q.   Right.

---

f8db266c-66e6-4532-a536-4dd87a42774c

Jeff Tarbutton
February 18, 2008

35

1      A. They're not the same color and
2  they're not the same markings and not the
3  same size as the boxes used to store the
4  patio furniture and patio furniture padding
5  that was in the warehouse below this roof
6  when it came down. Those boxes are enough
7  different that I think it's very possible one
8  of those boxes floated over and was pinned
9  against the face of the scupper. There's
10  another possibility and that is --
11      Q. Wait a minute. Before you
12  leave these boxes, are you talking of a box
13  that would be up on the roof?
14      A. Yeah.
15      Q. Well, what's your best
16  assessment as to how those boxes got there?
17      A. The only way that I know of
18  them getting up there would be that they were
19  boxes used by the roofer to carry materials
20  up there or maybe perhaps they were the
21  containers for fasteners or something that
22  they used up there.
23      Q. Well, did you make any
24  photographs of those boxes?
25      A. They were not in the debris

36

1  when I got to the project. They were in the
2  debris when Norman Johnson was there. They
3  were not there when I was there.
4      Q. Are there any photographs of
5  those boxes?
6      A. Yeah. They're in Mr. Johnson's
7  photos.
8      Q. Show them to me.
9      A. It's Photo 24. You see in the
10  far right-hand corner, right in the middle of
11  the right-hand edge of that photograph?
12      Q. Well, point to me on my copy.
13      A. This is a box. That one right
14  there. And that's on top of the roof debris.
15      Q. I'm on --
16      A. No. The bigger one. Let me --
17  if you'll excuse me, I'll come around there
18  and we can look at it from the same
19  direction. This box with all of those
20  markings on the side, that's patio furniture.
21  This box has none of those markings. It's a
22  different color. And it's on top of the
23  roof. There's a second one here --
24      Q. Well, now, wait a minute. The
25  one that I have the arrow going to --

37

1      A. The one that you have marked
2  came down. It's on top of the roof. And it
3  does not match the boxes that were in the
4  warehouse.
5      Q. But are you testifying with
6  absolute certainly that this box that I
7  marked with an arrow was on top of the roof
8  before the roof collapsed?
9      A. Oh, yeah. That's about the
10  only way to get it there. That's about the
11  only way to get that to be there.
12      Q. And tell me again how you
13  figure that that's the only way it can be
14  there.
15      A. Well, and while I'm here,
16  that's a second one there (indicating).
17      Q. This is --
18      A. Those are two boxes that are on
19  top of the roof debris. If I have a roof
20  that collapses and the roof is coming down
21  rapidly on the top of other boxes with large
22  quantities of water coming down with it, and
23  I wind up with boxes that are on top of that
24  old roof membrane in contrast to the
25  warehouse boxes which are below the roof

38

1  membrane, then I've got to believe that that
2  is at least a possibility that that box is
3  what obscured or obstructed the scupper
4  opening.
5      Q. Okay. And you understandably
6  used the word "possibility"?
7      A. Oh, yes, sir.
8      Q. But --
9      A. Once this --
10      Q. Let me be clear about this:
11  You're not about to testify under oath that
12  it's more likely than not that these two
13  boxes were on the roof near the scupper
14  before the roof collapsed, are you?
15      A. I believe these boxes were on
16  the roof. I will be happy to testify to that
17  because of the orientation -- there are
18  several things. The orientation of the
19  boxes, the location of the boxes, they're
20  different from the warehouse containers that
21  were used by the insured, Mr. Teague, in this
22  case.
23      Q. Well, did you ask Mr. Teague
24  about these two boxes?
25      A. Mr. Teague -- I think I did.

Jeff Tarbutton
February 18, 2008

---

**39**

1    And I don't think he remembers these two
2    boxes. But he can testify for his own about
3    that. I don't have a clear memory about what
4    he said about those.
5        Q. Well, but when you were there,
6    these two boxes were gone?
7        A. They were gone or had just
8    succumbed to the weather or something. I
9    don't know. But they were not in the
10   collapsed debris when I got there.
11       Q. All right. Now, is there
12   anything else, in your opinion, that would
13   have blocked the scupper other than these two
14   boxes you've identified in Photo 24?
15       A. The only other thing that seems
16   to be -- to have some merit, to give me some
17   merit for the -- well, let me back up.
18       Not the only other thing.
19   There's a couple of other things. But one is
20   there's a little bit of polystyrene -- let's
21   see. That's not in Johnson's report. Let me
22   go back over here. In Photo 25, there's a
23   photograph of a black trash bag. And there's
24   some loose expanded polystyrene that's
25   coming -- see, he shows it in Photo 25 and

**40**

1    Photo 26. That's the same. In fact, it's
2    also in that Photo 24. So the trash bag on
3    the roof that had expanded polystyrene
4    insulation, this is the insulation that was
5    under the old membrane that they were
6    replacing. So as they took the old membrane
7    off, they would remove this white stuff. My
8    guess is that the mechanics up there put this
9    in plastic trash bags.
10       Q. What was the color of the old
11   and what was the color of the new as you
12   understand it?
13       A. The new material was pink, and
14   the old material was white. One is an
15   extruded polystyrene. That's the new pink
16   material. The other is an expanded
17   polystyrene similar to a polystyrene coffee
18   cup. And that's the old material.
19       Q. All right. But you identified
20   this trash bag. We can see the trash bag
21   didn't get near the scupper, did it?
22       A. Well, this trash bag -- well,
23   you don't know that. You don't know that at
24   all.
25       Q. Well, you don't see it anywhere

**41**

1    near the scupper.
2        MRS. LONG: Object to the form.
3        A. You don't know that because --
4    I'm sorry. The reason you don't know that is
5    because once this thing collapses, once the
6    water gets on this roof and is moving -- see,
7    this is a plastic bag full of plastic
8    insulation; it can float. So you have a
9    situation here where this thing may have
10   moved. Now, this particular bag, I don't
11   think this particular bag was over beside the
12   scupper, but I cannot tell you exactly where
13   it was. But these things do have a tendency
14   to move once the collapse is underway and the
15   water washes down into the building.
16       Q. All right. We've talked about
17   the two boxes identified in Photograph 24.
18   We've talked about the trash bag that's seen
19   in Photograph No. 25 and Photograph No. 24.
20   Any other debris that in your judgment
21   blocked the scupper?
22       A. The scupper itself, of course,
23   was gone and down under the wall when I got
24   there. I believe that the other possibility
25   is a piece or pieces of polystyrene, of the

**42**

1    white polystyrene. Because I found when I
2    got there last week, there are probably about
3    a half a dozen relatively small, on the order
4    of 10 inches or 12 inches across, type pieces
5    that had gotten lodged in the top of the pipe
6    draining from that -- what we call it, a
7    drain box.
8        Q. Now, are those in your
9    Photographs 9 -- I guess it's just 9. Look
10   at Photograph No. 9.
11       THE WITNESS: Let me see that
12       one there. I think that's
13       a copy of my very own
14       report.
15       A. Yeah, No. 9 is the box. And
16   then 10, 11, and 12 are additional pieces of
17   polystyrene inside the top of the pipe which
18   is just downstream of the box.
19       Q. Now, when you say the box,
20   that's the drain box?
21       A. That drain box, yes, sir.
22       Q. And the two scuppers empty into
23   the drain box?
24       A. They do.
25       Q. And when you examined the drain

---

Jeff Tarbutton
February 18, 2008

43

1  box, you found this -- what's the white
2  material?
3         A.  Expanded polystyrene.
4         Q.  You found this polystyrene in
5  the top of the drain box, right?
6         A.  And in the top of the attached
7  pipe, yes, sir.
8         Q.  So if you look at Photograph
9  No. 9, that's the top of the drain in close
10  proximity to the two scuppers, right?
11         A.  Yes.
12         Q.  Okay.  Then if you look at
13  Photograph 10, 11, and 12, where were those
14  pieces of material located?
15         A.  Well, if you back up to
16  Photo 9, that's the drain box.  And then the
17  next ones are -- what I did was I physically
18  removed those pieces of polystyrene to
19  examine the top of -- it's a 12-inch
20  drainpipe coming from that box.  Those are
21  downstream of the drain box in the top of the
22  pipe.  There's a tapered transition that goes
23  from the box to the top of the pipe.
24         Q.  Now, would that white material
25  be the old white roofing material that you

44

1  testified was being removed and being
2  replaced with the pink?
3         A.  Yes, sir.  That is exactly what
4  it is.
5         Q.  And you called it poly what?
6         A.  Polystyrene.
7         Q.  Well, do you have an opinion as
8  to whether or not those pieces of polystyrene
9  came through the scupper that we've been
10  talking about and into the drainpipe?
11         A.  Do I have an opinion about
12  that?
13         Q.  Yes.
14         A.  All I can really say there is:
15  I think it's consistent with having those
16  pieces on the roof finding there way through
17  the scupper.  I cannot tell you, as we sit
18  here today, and I wouldn't testify to it that
19  they for sure got there while the roofing
20  work was being done.
21         Q.  Well, did they get there
22  because of the rainstorm, in your opinion?
23         A.  It's hard to know.  Because
24  neither of the first two investigators
25  photographed that part of the drain box.  So

45

1  I don't know what the condition was at that
2  time.
3         Q.  Well, did you review the
4  photographs of Norman A. Johnson?
5         A.  He did not take any pictures of
6  that part of the pipe.  So there's no
7  photograph of that drain, the top of that
8  drain.  And I haven't seen any photographs by
9  Mr. Sheehan, but he doesn't refer to it in
10  his report.
11         Q.  Well, if Mr. Johnson testified
12  today that he did photograph that part of the
13  drain, would that prompt you to look back at
14  his photographs?
15         A.  I would be glad to look at his
16  photographs.
17         Q.  All right.  Look at Photograph
18  Nos. 14, 15, and 16.
19            (Witness reviewed photographs.)
20         A.  Okay.  These are the drain box,
21  Mr. Parsons.  These are not the attached
22  pipe.  So when he took his pictures, there's
23  none of this polystyrene panels in 15 or 16.
24  And there are no photographs of the condition
25  of the pipe immediately downstream of this

46

1  drain box.
2         Q.  Well, I thought you just
3  testified that Photograph No. 9 was the very
4  top of the drainpipe right in close proximity
5  to these two scuppers?
6         A.  No, sir.  Let's define our
7  terms.  I've got two scuppers.  They drain to
8  what I'm calling a drain box.  That's the
9  rectangular opening where your thumb is there
10  on that photo.  Is that 9?  Is that my 9?
11  Yes, sir, it is.  That's how the box looked
12  when I got there.
13            When Mr. Johnson was there,
14  these polystyrene pieces were not in this
15  drain box.  But now, what you have to
16  remember is this drain box then makes a
17  transition from this rectangular sub box, and
18  there's a transition, a fabricated steel
19  transition that goes to a 12-inch diameter
20  pipe.  The 12-inch diameter pipe then
21  continues on down to a little office
22  underneath the roof.  Drops into an old
23  brick -- that's an old open brick storm inlet
24  that's part of the city drain system.  But
25  that polystyrene that you see in my photos

13  (Pages 43 to 46)

Jeff Tarbutton
February 18, 2008

47

1  was not at the top part of the drain box in
2  the photos Norman Johnson took.
3      Q.  Well, how far down was it?
4      A.  When Norman Johnson was there
5  or when I was there?
6      Q.  No.  When you made your
7  photographs.
8      A.  These pieces you see in my
9  photos, 11 and 12, go all the way down to and
10  are pinched into the top of the 12-inch
11  diameter pipe.  There's about ten or twelve
12  pieces in there.
13      Q.  So if you look at Photograph
14  No. 9, isn't this polystyrene right up at the
15  top of the drain opening?
16      A.  It's -- well, if by drain
17  opening you mean at the side of the box.  The
18  bottom of that box is tapered down.
19      Q.  Well, let me approach it this
20  way.
21      A.  Okay.
22      Q.  Look at your Photograph No. 9,
23  and this is, say, the beginning of the drain,
24  right, going down?
25      A.  Yeah.  That's the box.

48

1      Q.  Then we have this part which
2  comes up to the scupper, a scupper?
3      A.  This is the north scupper.  The
4  west scupper is not shown in that photograph.
5  But that's a scupper.  It drains to that box.
6  That's correct.
7      Q.  All right.  Well, let me do
8  this.  This part of this opening right here
9  is a scupper, right?
10      A.  I'm not sure.  Let me study it
11  for a moment and make sure.
12      (Witness reviewed document.)
13      A.  Yes.  The right-hand side of
14  this photograph is north.
15      Q.  Okay.  Let me mark that.
16      A.  And the west -- the collapsed
17  area, would be this way up at the top of the
18  page.
19      Q.  All right.  This is -- I'm
20  going to kind of mark -- this is the north
21  scupper?
22      A.  Yep.  Yes, sir, it is.
23      Q.  Okay, and in fact, if we
24  compare it to Photograph No. 15 of
25  Mr. Johnson, this is the north scupper?

49

1      A.  It is.
2      MR. PARSONS:  All right.  And
3  for the Record, I have
4  marked north scupper.  I'm
5  going to mark this as a
6  separate exhibit.
7      His report that I
8  have in front of me is
9  Defendants' Exhibit 8.  And
10  for the Record, his
11  Photograph No. 9, I have
12  written in the words "north
13  scupper," and he's
14  identified that as being
15  depicted in Photograph
16  No. 9.
17      Also, in Norman
18  Johnson's report, I have on
19  page nine, Photograph 15,
20  identified the north
21  scupper.
22      (Whereupon Defendants' Exhibit
23  No. 8 was marked for
24  identification and attached
25  hereto.)

50

1      Q.  Now my next question, please,
2  sir:  Now that we have correlated these two
3  photographs, can you explain why in the
4  photograph you made you see this polystyrene
5  which is near the top of the drain near the
6  scuppers, and you don't see that in the
7  photographs made by Norman Johnson?
8      A.  Is that a question?
9      Q.  Yes.
10      A.  And what's the question?
11      Q.  How do you explain that you can
12  see this white -- I'm going to call it white
13  material -- in your Photograph No. 9, and it
14  appears it's near the top near the scuppers,
15  yet --
16      A.  It's in the box.  That's
17  correct.
18      Q.  -- when Norman Johnson made his
19  photographs, that white material was not
20  there?
21      A.  It was not there, because I
22  think what we're seeing, those larger pieces
23  that we see in my photo -- is that 9?
24      Q.  Yeah.
25      A.  My belief is that those came

Jeff Tarbutton
February 18, 2008

51

1    from the weathering of the edge of the old
2    membrane that over the months following the
3    loss, it had gotten picked up by wind, torn
4    up, degraded, whatever, and gotten blown over
5    onto this other roof.
6        Q. All right. Well, let me see if
7    I understand your answer. You see that white
8    material in your Photograph No. 9?
9        A. Sure. Yes, sir.
10       Q. Is it your best assessment that
11   that was blown into the drain some time after
12   the collapse of the roof?
13       A. Blown into or someone up there
14   messing around with it. I don't know. But
15   it got there after Mr. Johnson's departure
16   from the scene. And therefore, it's a
17   post-collapse accumulation, at least as far
18   as that part of the box goes.
19       Q. Well, this white material we
20   see in Photograph No. 9, in your opinion, had
21   absolutely nothing to do with the collapse of
22   the roof?
23       A. Not necessarily. Now, the
24   larger pieces you see in the drain box, I
25   would agree with that, absolutely. But

52

1    there's more of it than that. And so I
2    can't -- I would not give a blanket statement
3    that it absolutely had nothing to do with the
4    collapse.
5        Q. But when you look at Norman
6    Johnson's Photograph No. 15 and No. 16 and
7    you look at your Photograph No. 9, it's clear
8    to you that some time after Norman Johnson
9    made his photographs, that this white
10   material got in the drain?
11       A. Oh, absolutely.
12       Q. All right. Did you make any
13   inquiries or investigation to see what amount
14   of rainfall there was before the occasion of
15   the collapse?
16       A. I did not even get a chance to
17   do that. I would intend to do that between
18   now and trial if I have the opportunity. I
19   did attempt to do it on an Internet research.
20   I was not successful in getting to a clear
21   description of the rainfall. That's not
22   difficult to do, but I didn't get that done.
23       Q. Did you find that the building
24   was almost a hundred years old?
25       A. I assumed it was somewhere

53

1    north of 75 years, sir, but I didn't identify
2    the specific age.
3        Q. Is it true that you found
4    termite damage and other structural damage or
5    defects which made for a weak roof and to
6    some extent contributed to the collapse?
7            MRS. LONG: Object to the form.
8        A. I would say -- no. Well, weak
9    roof, I would want to define my terms. I
10   didn't find any evidence of a problem of
11   termite damage in the roof members
12   themselves. But by that, I would
13   specifically say the roof beams and what I
14   will call the roof joists, those, and the
15   roof decking. Those did not indicate any
16   termite damage. There was termite damage in
17   some of the supporting posts which affected
18   the orientation of the collapse.
19       Q. Well, there were posts that
20   supported the roof, right?
21       A. Yes, absolutely. Yes, sir.
22       Q. And some of those posts were
23   badly damaged by termites?
24       A. The one that fell down had been
25   damaged by termites.

54

1        Q. Okay. And in all fairness,
2    didn't the condition of that post or those
3    posts contribute to the collapse of the roof?
4        A. Yes, we can say that. I would
5    not say it to the contrary. The post was
6    damaged by termites, therefore, would not
7    have been as strong as a sound -- in this
8    case, they're eight by eight posts.
9        Q. Well, how many posts were
10   there, if you know, that supported the part
11   of the roof that collapsed?
12       A. Well, you have to define your
13   terms. The posts are pretty uniformly set at
14   14-foot centers both north and south and east
15   and west. The particular collapsed area
16   involved the complete collapse of one post,
17   the partial collapse of the second post
18   immediately south of the main one, and then
19   naturally, of course, it affected then six --
20   what we would call bays or six areas of the
21   roof that are each about 14 feet square, to
22   involve an area that would be 28 feet east to
23   west by about 42 feet north to south.
24       Q. And in reading your opinions, I
25   see that in the principal opinions you use

Jeff Tarbutton
February 18, 2008

55

1  the word "possible" or "possibility"?
2       A.  And that would be in where,
3  sir?
4       Q.  In No. 7 on page five and No. 8
5  of page five.
6       (Witness reviewed document.)
7       A.  I'm using the word "possible"
8  in the perspective of identifying the
9  specific item that blocked the scupper. I'm
10  convinced the scupper was blocked, whether it
11  was by the cardboard boxes and the debris or
12  it may have been some pieces of that white
13  polystyrene. I honestly don't know which of
14  the two or perhaps combination of the two or
15  perhaps some other kind of -- you know, a
16  trash bag or a little piece of cut membrane.
17       Q.  Well, if you look at your
18  Opinion No. 7, it says, In my opinion, the
19  presence of a number of small pieces of white
20  polystyrene within the roof drain indicates
21  that debris from the roof had found its way
22  into the drain box.
23       A.  Yes.
24       Q.  You now state, quite frankly,
25  that having reviewed the photographs of this

56

1  drain box made by Norman Johnson, that, more
2  likely than not, these pieces of white
3  material got into the drain box after he made
4  his photographs?
5       A.  No. I'm saying the large
6  pieces that you can see in that drain box,
7  there's no question they got there after the
8  collapse. I don't have a problem with that.
9  What I have a problem with, and I tried to
10  describe that in Opinion No. 7, there's a
11  number of small pieces of polystyrene. I
12  don't have a photograph and neither Sheehan
13  or Johnson bothered or attempted -- or at
14  least, as far as I know, neither of them got
15  down into that drain to find out what was
16  downstream of that drain box, if anything. I
17  am telling you, and I'm sticking with this
18  idea, that those smallish pieces that are in
19  there happened to be, conveniently enough,
20  about the size of what we see with this
21  little trash bag that shows in Mr. Johnson's
22  Photo No. -- let me see. Is it nine?
23       (Witness reviewed photographs.)
24       A.  It's not nine. Let me see.
25  I'll be there in just a minute. His Photo

57

1  Nos. 24 and 25, those pieces of polystyrene
2  that I took out of the drain are similar in
3  size to a couple of those pieces that show up
4  in Mr. Johnson's photograph.
5       Q.  Photographs 24 and 25?
6       A.  Yes, sir. I'm sorry. Yeah,
7  Photographs 24 and 25.
8       Now, with that said, clearly
9  some of those pieces got in there following
10  the collapse. I understand that.
11       Q.  And after his photographs?
12       A.  Oh, yes, after his photographs.
13  My belief is that these are consistent with
14  what I would expect if some of these pieces
15  had gotten left on the roof. Because these
16  don't have to all get left on the roof at the
17  same time. All they have to do is be there
18  when a little bit of rain or a little bit of
19  wind comes along and carries them down to the
20  scupper, because they're small enough to fit
21  conveniently in the scupper.
22       Now, I don't know why nobody
23  looked at them when they were there. I
24  wished they had. It would make this argument
25  a little bit easier to make. There's clearly

58

1  pieces of the polystyrene over there
2  following the collapse. I am of the
3  opinion that I don't -- I have a hard time
4  making all of those little pieces get into
5  that drain box entirely after the collapse.
6       Q.  Well, is it true that, as far
7  as you know, no one after the collapse or
8  shortly after the collapse, found any of this
9  poly white material in the drain?
10       A.  No one documented it. That is
11  correct.
12       Q.  Now, in the past, have you
13  given opinions about the cause of a roof
14  collapse?
15       A.  Yes, sir.
16       Q.  On how many occasions?
17       A.  Twenty or more.
18       Q.  Has there ever been an occasion
19  in the past when it was your opinion that
20  there was liability or fault on the part of a
21  roofer which caused a roof collapse?
22       A.  Absolutely, yes.
23       Q.  Have you ever testified in
24  favor of a roofer saying that there was no
25  fault of liability on the part of the roofer

f8db266c-66e6-4532-a536-4dd87a42774c

Jeff Tarbutton
February 18, 2008

59

1    causing the collapse?
2         A. Have I testified to that?
3         Q. Or given an opinion?
4         A. I've given an -- let me think.
5    Yes.
6         Q. Do you have a list of these
7    cases?
8         A. I've got pretty exhaustive
9    lists. We purge the files after about five
10   years. But, yeah, there's lists of them,
11   sure. I mean, I can remember a few of them
12   off the top of my head if you want to go
13   there. I mean, I'll be glad to dig all of
14   that up. It's just I work by the hour, so
15   I'll tell my secretary and go find them.
16        Q. On how many occasions have you
17   testified in court?
18        A. In actual court?
19        Q. Yes.
20        A. Probably twenty or more,
21   twenty-five or more.
22        Q. Have you testified in federal
23   court?
24        A. Yes, sir.
25        Q. Have you testified in the

60

1    Middle District of Alabama?
2         A. I don't remember if I have or
3    not. I have testified in Alabama, in
4    Birmingham, but I don't remember if I've
5    testified in Montgomery. Or in the court
6    that you referred to, I don't know where that
7    is necessarily, so . . .
8         Q. Have you testified in court
9    where Judge Mark E. Fuller was the judge?
10        A. Not that I know of.
11        Q. Do you know Judge Mark E.
12   Fuller?
13        A. No.
14        Q. State again your residence.
15        A. I didn't state it.
16        Q. Well, what is your residence?
17        A. The street address and all of
18   that, is that what you need?
19        Q. Right.
20        A. It's 1012 Billy, B-I-L-L-Y,
21   McGee, M-C-G-E-E, Road. The town is
22   Lawrenceville, Georgia, and it's 30045.
23        Q. If I understand correctly, it's
24   your opinion that debris blocked the scupper
25   and allowed water to back up and accumulate

61

1    on the roof?
2         A. Yes, sir.
3         Q. It's not your opinion that
4    debris blocked the drain causing water to
5    back up all the way through the scupper onto
6    the roof and whatever?
7         A. I'm more inclined to go with
8    the scupper on the westerly side of that
9    dividing wall than I am the drain downstream.
10   Anything downstream could have impacted it,
11   but -- the problem is, is that I think the
12   presence of the debris in the pipe drain is
13   consistent with that drain being fouled or
14   the capacity of that pipe being compromised.
15   I don't know when exactly the debris got in
16   there. That's what I wish I did know. And I
17   don't know that. At the same time, then,
18   that leaves me with whether or not I consider
19   it likely probable that the scupper was
20   blocked to the point that it caused the roof
21   to collapse. And the answer that I would
22   give to that is clearly it was.
23        Q. But it's my understanding that
24   you know of no evidence that there was debris
25   in the drain itself which caused or

62

1    contributed to cause the backup?
2         A. Right now, I don't have that
3    piece of evidence. That is correct.
4         Q. All right. So that means
5    you've to go with the scupper?
6         A. No. The absence of evidence is
7    not the same as the evidence of absence.
8    Therefore, the sizing and the distribution of
9    those pieces of polystyrene in the upper end
10   of that drain at the time the roof work was
11   undertaken, that cannot be ruled out. I
12   cannot make an unequivocal statement that it
13   was there, but neither can anyone deny it's
14   presence, because no one checked, including
15   the roofer, Mr. Johnson, and Mr. Sheehan. No
16   one has given me any evidence that it was not
17   there. So I cannot rule out the possibly
18   that it was there. And that's why it says a
19   possibility and not a probable presence.
20   What I can testify to and will testify to --
21   I'm glad to do this way -- and that is,
22   about the only way to get this roof to come
23   down is to put a ton of water on the west
24   side of that parapet wall where that scupper
25   drains in that drain box. That's what caused

Jeff Tarbutton
February 18, 2008

63

1  this roof to come down.
2      Q.  Well, isn't it true that you
3  also found that the scupper was inadequate in
4  terms of --
5      A.  Inadequate?
6      Q.  -- draining the water?
7      A.  Absolutely not.  To the
8  contrary.
9      Q.  I thought you made some mention
10  about there was not a backup or an emergency
11  system?
12      A.  Well, now, that's a different
13  question.  That's a different issue.
14      Q.  What's the difference?
15      A.  The issue is that scupper as it
16  was sized at the time of the collapse, and
17  this is based on my personal measurements.
18  And I've measured several different ways to
19  make sure that I got fairly good dimensions.
20  And my analysis of that scupper and the drain
21  capacity is that it was about -- had about
22  two times the capacity it would be required
23  to have under what we would identify as a
24  100-year storm drain condition.  That's 3.7
25  inches of rainfall per hour.  That's a

64

1  terrific storm.  I analyzed the scupper box
2  on the basis of that 100-year design premise.
3  The scupper box has two times the capacity
4  it's required.  That may be 1.97 or it may be
5  2.04, but something like that.  If the
6  scupper has that much capacity, and as it
7  turns out the scupper size and the pipe size
8  are very similar in area, therefore, the flow
9  rates for those two will be similar.
10  Therefore, the drainage capacity of that
11  scupper as I found it was absolutely
12  acceptable.  Now, was there an emergency or
13  backup drain for that scupper?  There was
14  not.  In other words, if you lost the
15  scupper, you lost the roof.
16      Q.  What were the dimensions of the
17  scupper outlet?
18      A.  The scupper outlet was about --
19  let me refer to my notes here.
20          (Witness reviewed document.)
21      A.  The scupper box, the galvanized
22  box itself, was about 25 inches wide.  It was
23  about 7 1/2 inches high.  It was about 15
24  inches in depth across the wall.  The
25  thickness of the old brick wall is about

65

1  15 inches.
2      Q.  So about 7 1/2 inches high and
3  about 25 inches wide?
4      A.  Yes, sir.
5      Q.  And say how deep.
6      A.  Fifteen inches from side to
7  side.  Now, that's the scupper box.  Now,
8  from the interior side where the membrane had
9  been wrapped around the inside of the scupper
10  box, that was slightly narrower, and it's
11  actually a tad wider.  It's about 4 1/2 to
12  5 inches in height.  It was 24 1/2 inches
13  wide and about 16 inches deep.  So it was
14  slightly -- when they finished that all off,
15  it made the size of the scupper opening
16  smaller.  My analysis is based on the small
17  size, not on the large size.  And that's
18  where I determined that the flow rate that
19  the scupper provided was about twice what was
20  required.
21      Q.  Is it true that you did not
22  interview anyone that saw an accumulation of
23  water on the roof before the collapse?
24      A.  I didn't interview anybody that
25  saw it, no, sir.

66

1      Q.  Well, you don't have any data
2  or information now as to how much water was
3  on the roof when the roof collapsed, do you?
4      A.  Just enough to make it fall.
5  But as far as specific depth, I don't have a
6  specific depth.
7      Q.  Well, you have to make an
8  assumption as to the amount of water?
9      A.  No, I don't.
10      Q.  Well, it seems to me like what
11  you're saying is, Well, the roof collapsed,
12  and that because it collapsed, that means
13  there was too much weight of water?
14      A.  That's exactly what that means
15  in the absence of some other compelling
16  defect.  They don't have some other
17  compelling defect.
18      Q.  Well, what about the defect of
19  the support columns that were rotten or
20  defective because of termite damage?
21      A.  The support columns did not
22  have the capacity that they would have had
23  had they been sound, that's true.  I still
24  have to put a bunch of water on the roof to
25  make them fall down.

Jeff Tarbutton
February 18, 2008

67

1    Q.  Well, if there had been no
2  rainstorm and no water and this roof
3  collapsed, what would be your opinion about
4  the cause of the collapse?
5    A.  It would depend on what I found
6  when I got there.  I mean --
7    Q.  Well, would it be true that
8  you've been involved in a number of roof
9  collapse cases where accumulation of water
10  was not involved?
11    A.  There have been several, but it
12  usually would relate to some other problem.
13  The most common cause is ponding.  Fires will
14  cause a roof to collapse.  A deficiency in
15  the wood trusses will cause the roof to
16  collapse.  An overload.  Somebody just
17  forgets to design for something, that will
18  make them collapse.  But most of the time
19  when it's this kind of case, it's usually
20  from ponding.
21    Q.  Now, have we covered all of
22  your opinions and findings?
23    A.  Mostly.  I think there's a
24  couple of other little fine tuning.  But as
25  far as the structural issues go, yes.

68

1    Q.  All right.  Well, what are the
2  points you refer to as fine tuning?
3    A.  The only other point that I
4  would make is that the presence of the single
5  scupper was an obvious and open condition,
6  and therefore, known to the roofing
7  contractor.  And at that point, as I -- you
8  know, we -- it's clear at that point that
9  you've only got one shot at getting it
10  drained.  So if that drain gets fouled for
11  any reason or obstructed, there could very
12  well be a problem like this.  But I think,
13  otherwise, I mean, you've already covered my
14  opinions.
15    Q.  Well, if I understand your
16  opinion in that regard, there was a
17  responsibility on the part of my client to
18  see that that scupper did not get clogged or
19  stopped up?
20    A.  That's exactly my opinion, yes,
21  sir.
22    Q.  But it's still your opinion
23  that even if he was an expert in scuppers,
24  that if he looked at it, he would be
25  satisfied it was adequate?

69

1    A.  Adequate is probably not the
2  right term.  He's got one shot.  There's one
3  scupper that has to drain.  This roof also
4  has pretty substantial slope that goes down
5  to that scupper.  So if this thing gets
6  obstructed for any reason, there's going to
7  be a serious problem.  And this is the
8  problem that ensued.  Now, whether a roofer
9  can just walk by and say, Well, that's
10  exactly the right scupper, he cannot possibly
11  know that.  Well, maybe he can depending on
12  his experience and training and education and
13  all of that stuff.  But he does know at that
14  point.  And the crews that were up there knew
15  this is the only scupper we've got on this
16  part of the roof.
17    Q.  Well, we're still dealing with
18  a duty on his part to see that the scupper
19  doesn't get blocked?
20    A.  In my opinion, there is that
21  duty.
22    Q.  Now, assuming that there was
23  this rainstorm and a lot of rain, assuming
24  further that the scupper did not in any way
25  get impaired or stopped, do you have an

70

1  opinion as to what caused the roof collapse?
2    A.  If the scupper functions
3  properly, then we don't have this meeting.
4    Q.  Well, I'm asking you to make
5  these assumptions.
6    A.  If those assumptions are true,
7  there's not going to be a collapse that looks
8  like this and have the characteristics which
9  this one did.
10    Q.  So in other words, you don't
11  have another opinion as to the cause of this
12  particular collapse assuming that the scupper
13  did not get blocked?
14    A.  If the scupper did not get
15  blocked, then that roof should not have
16  collapsed.
17    MR. PARSONS:  Okay.  That's all
18    the questions I have.
19    MRS. LONG:  Okay.  I'll follow
20    up with just a couple.
21    Have you marked his
22    report as an exhibit?
23    MR. PARSONS:  Yes.  But I also
24    want to get a copy of his
25    file before he leaves.  Can

Jeff Tarbutton
February 18, 2008

71

| | |
|---|---|
| 1 | you have somebody do that? |
| 2 | And that's going to be |
| 3 | Exhibit No. 7. This is a |
| 4 | copy of his report proper. |
| 5 | That's his field notes and |
| 6 | so forth. |
| 7 | (Whereupon Defendants' Exhibit |
| 8 | No. 7 was marked for |
| 9 | identification and attached |
| 10 | hereto.) |
| 11 | MRS. LONG: Okay. We're going |
| 12 | to put it on a sheet of |
| 13 | paper. And do you have a |
| 14 | CV? |
| 15 | MR. PARSONS: That's this one |
| 16 | if you want to mark it. |
| 17 | (Whereupon an off-the-Record |
| 18 | discussion was held.) |
| 19 | EXAMINATION |
| 20 | BY MRS. LONG: |
| 21 | Q. Mr. Tarbutton, I've marked your |
| 22 | CV as Plaintiff's Exhibit 6. If you don't |
| 23 | mind, just kind of give me a little -- you |
| 24 | don't have to go through everything that's on |
| 25 | there, but just give me a little background |

72

| | |
|---|---|
| 1 | and training, education, and experience. |
| 2 | (Whereupon Plaintiff's Exhibit |
| 3 | No. 6 was marked for |
| 4 | identification and attached |
| 5 | hereto.) |
| 6 | A. My graduate degree is a |
| 7 | Bachelor of Science in Civil Engineering at |
| 8 | Ohio State. And I went back for a Civil |
| 9 | Engineering degree, which at Ohio State means |
| 10 | I took the Master's level and completed |
| 11 | Master's level courses, but I did not write a |
| 12 | thesis. So I have the two degrees from Ohio |
| 13 | State, which is the sum of my formal |
| 14 | education. |
| 15 | And just attendance at various |
| 16 | and sundry seminars over the years. And then |
| 17 | I actually present seminars on roofing and |
| 18 | roof issues, typically through the CEU |
| 19 | Institute out of Florida. That's usually |
| 20 | done for continuing education credits for |
| 21 | insurance people. I've done that at several |
| 22 | venues. |
| 23 | My work since about 1975 has |
| 24 | been always in building materials. Early in |
| 25 | my career I worked as a geotechnical |

73

| | |
|---|---|
| 1 | engineer. After about 1980, 1981, I just |
| 2 | entirely concentrated on forensic and failure |
| 3 | analysis work. And that involves just a |
| 4 | variety of failures, usually involving -- |
| 5 | customarily involving issues of the |
| 6 | performance of a building. And I've also |
| 7 | been engaged a number of times in the review |
| 8 | of liability issues concerning contractors, |
| 9 | both general and subcontractors. |
| 10 | Q. And I think earlier you stated |
| 11 | to Mr. Parsons that you've looked at twenty |
| 12 | or over roof collapse cases? |
| 13 | A. I think that's about right. I |
| 14 | don't remember. I've been doing this a long |
| 15 | time, so . . . But that sounds about right. |
| 16 | Q. Okay. And just to do a quick |
| 17 | recap, part of your opinion was based upon |
| 18 | materials that you saw on the roof in the |
| 19 | photos that were provided to you that Norman |
| 20 | Johnson took, and in some of the materials on |
| 21 | the roof was a trash bag; is that correct? |
| 22 | A. Yes. |
| 23 | Q. Rolls of roofing material? |
| 24 | A. Correct. |
| 25 | Q. Pink stacks of insulation? |

74

| | |
|---|---|
| 1 | A. Yeah. That's the extruded |
| 2 | polystyrene, yes. |
| 3 | Q. Okay. White polystyrene? |
| 4 | A. Yes. |
| 5 | Q. That were in the trash bags? |
| 6 | A. Yes. |
| 7 | Q. And some boxes on the roof, |
| 8 | such as in 24, where there's some kind of |
| 9 | can? |
| 10 | A. Yes. |
| 11 | Q. And then did you notice some |
| 12 | cans in the photos as well? |
| 13 | A. There's at least one can in the |
| 14 | photo -- no. There's at least a couple, |
| 15 | because they had some -- yeah, this is a |
| 16 | larger can. And then there's a smaller, like |
| 17 | a cork can, that shows up in one of the other |
| 18 | photos. |
| 19 | Q. Okay. |
| 20 | A. In Photo 29. And some debris. |
| 21 | Actually, some sections of the new membrane |
| 22 | are up there. |
| 23 | Q. Okay. And in the collapsed |
| 24 | part of the roof where you can see where some |
| 25 | of the material has fallen down to the ground |

Jeff Tarbutton
February 18, 2008

75

1  floor level, were you able to see some of
2  these materials we've talked about on the
3  ground floor level?
4        A. I believe that a couple of
5  those boxes that are in the debris in the
6  photographs that Norman Johnson took were
7  boxes that contained accessories or equipment
8  or something for the roofing work.
9        Q. There were some of the other
10 materials that were found on the floor, like
11 the rolls of roofing material?
12       A. Yes, they are also there.
13       Q. Okay. And was it your opinion
14 that the collapse resulted from ponding on
15 the roof?
16       A. Yes, that's my opinion.
17       Q. And how did that ponding occur?
18       A. I believe the ponding arose
19 from some kind of obstruction of that scupper
20 that's in the wall that divides the western
21 and eastern parts of the building.
22       Q. From some of the materials that
23 were left on the roof?
24       A. That's my opinion, yes, that
25 one or several pieces of something. Or some

76

1  things, two some things, perhaps, or more.
2        Q. Okay. And you were not an
3  eyewitness, I believe you said, to this loss?
4        A. That's correct.
5        Q. Has it been your experience
6  that there's usually not eyewitnesses to
7  losses such as this?
8        A. It's usually -- I wouldn't say
9  usually. It's common that I don't have an
10 eyewitness.
11       Q. Okay. And I believe you stated
12 earlier that the drainage system, which all
13 we have in this building is the internal
14 drainage system, was adequate for the -- was
15 two times the capacity of a 100-year storm?
16       A. That's correct. That's the
17 scupper. I did not yet do an independent
18 tabulation for the 12-inch pipe. But since
19 the area is similar, the flow rate will also
20 be similar.
21       Q. Okay. So the scupper detail
22 was found to be adequate for the intended
23 rainfall?
24       A. Correct.
25       MRS. LONG: Okay. That's all I

77

1        have.
2        (The deposition of JEFFREY ALAN
3        TARBUTTON concluded at
4        2:59 p.m.)
5
6  *  *  *  *  *  *  *  *  *  *
7  FURTHER DEPONENT SAITH NOT
8  *  *  *  *  *  *  *  *  *  *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

78

1  *  *  *  *  *  *  *  *  *  *
2        REPORTER'S CERTIFICATE
3  *  *  *  *  *  *  *  *  *  *
4
5  STATE OF ALABAMA)
6  COUNTY OF MONTGOMERY)
7
8        I, Cornelia J. Baker, Certified Court
9  Reporter and Notary Public in and for the
10 State of Alabama at Large, do hereby certify
11 that on Monday, February 18, 2008, pursuant
12 to notice and stipulation on behalf of the
13 Defendants, I reported the deposition of
14 JEFFREY ALAN TARBUTTON, who was first duly
15 sworn by me to speak the truth, the whole
16 truth, and nothing but the truth, in the
17 matter of QBE INSURANCE CORPORATION, as
18 subrogee of Teague Properties, Plaintiff,
19 vs. THE ROOFING COMPANY, a Corporation;
20 MICHAEL FULGHUM, An individual, et al.,
21 Plaintiff, Civil Action No. 3:07-cv-393, now
22 pending in the United States District Court
23 for the Middle District of Alabama, Eastern
24 Division; that the foregoing pages contain a
25 true and accurate transcription of the

(334) 262-3332       Baker & Baker Reporting and Video Services, Inc.       (334) 262-3332

f8db266c-66e6-4532-a536-4dd87a42774c

Jeff Tarbutton
February 18, 2008

79

1  examination of said witness by counsel for
2  the parties set out herein; that the reading
3  and signing of said deposition was waived by
4  witness and counsel for the parties.
5      I further certify that I am neither of
6  kin nor of counsel to the parties to said
7  cause, nor in any manner interested in the
8  results thereof.
9      This the 20th day of February, 2008.
10
11

        Cornelia J. Baker
12      Certified Court Reporter, ACCR 290
        Certified Shorthand Reporter and
13      Notary Public for the
        State of Alabama
14
15      My Commission expired 6/9/08.
16
17
18
19
20
21
22
23
24
25